Bertone *v.* Department of Public Utilities.

MARIO BERTONE & another[1] *vs.* DEPARTMENT OF PUBLIC
UTILITIES & another.[2]

Suffolk. October 8, 1991. - January 6, 1992.

Present: LIACOS, C.J., WILKINS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Municipal Corporations*, Municipal electric plant, Municipal finance,
Fees, Utility "hook-up" charge. *Hull.*

In a proceeding to determine the validity of a municipal lighting plant's
    contribution-in-aid-of-construction (hook-up charge) provisions which
    were applied to collect a charge from the developers of a certain condo-
    minium project as a condition of the supply of electrical service to their
    project, the Department of Public Utilities could reasonably conclude
    on the record before it that the hook-up charge fell within the lighting
    plant's authority to structure its rates to meet costs incurred by its obli-
    gation to provide service to new customers and, further, the depart-
    ment's conclusion that resort to the hook-up charge to acquire funds for
    new equipment and improvements to the lighting plant's system did not
    involve the sort of project requiring financing after town meeting ap-
    proval under G. L. c. 164, § 41, was reasonable. [542-545]
In a proceeding to determine the validity of a municipal lighting plant's
    contribution-in-aid-of-construction (hook-up charge) provisions which
    were applied to collect a charge from the developers of a certain condo-
    minium project as a condition of the supply of electrical service to their
    project, the Department of Public Utilities correctly rejected the devel-
    opers' argument that the hook-up charge was unlawfully discriminatory
    because the charge financed capital improvements that materially bene-
    fit a large class of existing customers of the lighting plant who were not
    required to pay hook-up charges, where the record supported the de-
    partment's conclusion that the lighting plant's hook-up charge, differen-
    tiating between those who sought new or expanded service after August
    1, 1985, and those who connected to the system or expanded their use
    prior to that date, was based on classifications which were reasonable.
    [545-547]
In a proceeding to determine the validity of a municipal lighting plant's
    contribution-in-aid-of-construction (hook-up charge) provisions which

---

[1]Joan Bertone.

[2]Hull Municipal Lighting Plant, intervener.

were applied to collect a charge from the developers of a certain condo-
minium project as a condition of the supply of electrical service to their
project, the Department of Public Utilities, based on its conclusion that
the elements of the hook-up charge were sufficiently fixed to allow for
easy calculation based on the lighting plant's standardized worksheets,
correctly rejected the developers' contention that the provisions for the
hook-up charge were vague. [547-548]

A municipal lighting plant's "hook-up charge" as a condition of the supply
of electrical service upon new customers, and existing customers seek-
ing expanded service, who benefit from new or additional use of elec-
tricity after August 1, 1985, which was intended to meet expenses in-
curred in providing electric service to its new customers, constituted a
fee which the lighting plant could lawfully charge, rather than a tax
which it lacked the authority to assess. [548-550]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on August 13, 1990.

The case was reported by *O'Connor*, J.

*David A. Kellem* for the plaintiff.

*Eric A. Smith*, Assistant Attorney General, for Depart-
ment of Public Utilities.

*Jeffrey M. Bernstein* (*Kenneth L. Kimmell* with him) for
Hull Municipal Lighting Plant, intervener.

GREANEY, J. Mario Bertone and Joan Bertone (Bertones)
appeal from an order of the Department of Public Utilities
(department) granting summary judgment to the Hull Mu-
nicipal Lighting Plant (HMLP), and denying their request as
interveners for summary judgment. The department's order
was entered in connection with a petition by HMLP to deter-
mine the validity of its contribution-in-aid-of-construction
(hook-up charge) provisions which were applied to collect a
charge from the Bertones as a condition of the supply of elec-
trical service to their condominium project. The department
concluded essentially that the provisions requiring payment
of a hook-up charge were valid, and that the charge assessed
was neither unlawfully discriminatory nor lacking in suffi-
cient standards for proper application. A single justice of this
court reserved and reported the case to the full court. We
agree with these conclusions. We also reject the Bertones' ar-

. gument that the hook-up charge constitutes an unlawful tax. Consequently, we affirm the order of the department.

Facts included in a joint stipulation of facts (filed by the parties to establish a basis for summary judgment), and other information based on materials in the record before the department, disclose the following.

a. *The background of the dispute.* HMLP is a municipal electric department established pursuant to St. 1891, c. 370. In 1986, HMLP served approximately 5,120 retail customers, and in 1986 had total sales of approximately 32,000,000 kilowatt-hours, yielding revenues of approximately $3,302,000. In 1985, HMLP had a peak load of 7.5 megawatts.

On July 15, 1985, HMLP's board adopted the provisions in issue as paragraphs 25 and 26 of its general terms and conditions. These provisions took effect on August 1, 1985, and required, in paragraph 25, as a condition of the supply of electrical service, the payment of a hook-up charge by those seeking a hookup at a location not previously serviced by HMLP. Paragraph 26 provides that a customer seeking new or expanded service is required to pay an initial study fee to be credited against the final amount later calculated for the hook-up charge.[3]

The Bertones are the developers of Nantascot, a condominium building in Hull containing sixty-six residential units and one commercial unit. The Bertones requested from HMLP a permanent service hookup for Nantascot in April, 1986. Because Nantascot was a site not previously served by HMLP, it required, pursuant to paragraph 26 of the general terms and conditions, that the Bertones pay a hook-up charge before their project could receive electricity. On or about April 24, 1986, the Bertones paid HMLP $2,500 as an initial study fee under protest.

---

[3]It is not disputed that HMLP advertised the proposed provisions in accordance with G. L. c. 164, § 58 (1990 ed.), and gave the notice required for a price charge by G. L. c. 164, § 59 (1990 ed.).

The Bertones first requested actual service in the fall of 1986, so that they could begin work on the interior of the building. Using figures provided by the Bertones' electrical engineer, and figures prepared by its own consulting engineer, HMLP calculated the hook-up charge for Nantascot to be $86,849. By letter dated September 26, 1986, HMLP informed the Bertones of the charge and advised that it had to be paid as a requisite to Nantascot's receiving electrical service. The Bertones have paid the hook-up charge in full with a reservation of their legal rights to have the payment refunded if their challenge to the hook-up charge prevails. The hook-up charge assessed to the Bertones covered the cost of both the general system improvements and the site-specific improvements required to provide electricity to Nantascot. HMLP has not determined the exact cost breakdown between these two categories, but the majority of the fee covered improvements which were not specific to a particular site. Nantascot was substantially completed and ready for occupancy in September, 1987.

b. *Background and implementation of the hook-up charge.* Throughout the 1970's and early 1980's, HMLP's existing transmission, distribution, and supply system was capable of meeting the load requirements then imposed. Costs for maintenance and routine upgrading of the system were paid from monies collected through the existing rate structure. However, HMLP had determined that a substantial increase in load would necessitate improvements because its system was restricted by limitations on available transmission capacity, distribution equipment, and supply resources.

In 1984, HMLP's board first became aware that extensive real estate development was planned for Hull. At that time, there were proposals to build approximately 1,500 condominium units over a four or five-year period, an expansion that would impose demands for electricity far beyond the existing capacity of HMLP's system. As of January 22, 1987, when HMLP filed its petition with the department, the number of proposed condominium units had grown from 1,500 to approximately 2,000. This development could be expected to in-

crease HMLP's peak load by at least forty per cent over a very short period of time. Had this growth occurred as anticipated, HMLP's existing system would have been unable to serve all of the planned load as well as its current load. With this increased load, HMLP would then either have to refuse to serve new customers, curtail severely the quality and reliability of the supply of electricity that it could provide to existing customers, or both. HMLP estimated that it could be called on to make plant investments from $3,000,000 to $7,000,000, and possibly more, depending on the extent of development in Hull, the energy efficiency of the new construction, and the choice of heating and hot water systems. HMLP expected system improvements to be needed within a short time period.

HMLP further concluded that the use of electricity for heating, especially in resistance applications, could have severe financial and economic effects on existing and future ratepayers, and indirectly on Hull. HMLP also considered that high utility bills, in addition to being burdensome for future customers, would reduce the resale value of condominium units. In 1985, in order to plan an appropriate response to the projected development, HMLP entered a contract with an expert to analyze the issues raised by such development. Based on extensive analysis and study, the expert recommended that HMLP impose a hook-up charge for connecting new loads to the system.[4]

___

[4]The expert's recommendations were based on his documented conclusions that: (1) unless developers shared the costs of the system's expansion, such costs were likely to increase HMLP's rates for some time to come; (2) financing the necessary expansion would be difficult for HMLP and Hull; (3) severe time constraints existed on the expansion of HMLP's transmission and distribution system, and the resultant limit on short-term capacity indicated that measures that reduce contribution to peak demand per unit of development would tend to increase the amount of development that could be accommodated; (4) hook-up charges required that developers confront the costs that they are imposing on the system and on their own customers, thereby giving developers the incentive to select energy sources efficiently by considering costs beyond the initial construction costs; and (5) hook-up charges, when combined with offsets for conservation and load

HMLP also concluded that it would cost approximately $2,500,000 to finance the infrastructure improvements to HMLP's existing system necessary to accommodate the expected load growth. As a result of the expert's analysis, and HMLP's own determinations, HMLP proposed a development facilitation program to implement plans that would: (1) limit new hookups for electric space heating and hot water, and (2) charge applicants seeking a service hookup at a location not previously served by HMLP, as well as existing customers seeking substantially expanded service, a hook-up charge to reflect the costs imposed on HMLP for providing a service hookup and attendant system improvements.[5] The development facilitation program also imposed a moratorium on new electrical space and hot water heating, except in hardship cases. These restrictions were to last at least until August 1, 1990. To date, no one has challenged HMLP's authority to impose these restrictions, and many developments, which originally had considered more expensive heating systems have substituted alternatives, thus reducing anticipated demand.

Since August 1, 1985, the effective date of the addition of paragraphs 25 and 26 to HMLP's general terms and conditions, HMLP has instituted system improvements as part of its over-all plan to convert its distribution system from a 13,800 volt system to a 23,000 volt system. The improvements include reconductoring lines, redesigning distribution

---

management techniques, could effectively be used to encourage the efficient use of electricity.

[5]HMLP decided not to seek a bond issue to raise the revenue required to finance the necessary system improvements, because (1) HMLP considered that it would be unfair to require existing customers to pay for the cost of improvements that would be designed to serve load created by new or expanded uses; (2) HMLP's rates were already high in comparison to those of other towns and utilities; and (3) HMLP believed that Hull's financial condition was poor. In arriving at this last conclusion, HMLP did not formally consult with Hull's treasurer, board of selectmen, finance committee, or any other town official or board. HMLP also implemented the hook-up charge without seeking approval of the town meeting and without authorization of any Hull by-law.

lines and service connectors to accommodate new load, and installing and upgrading service in some parts of Hull. The conversion to a 23,000 volt system is not yet complete. HMLP has spent approximately $1,500,000 to date on system improvements and has collected approximately $600,000 in hook-up charges, all of which has been applied to the cost of improvements. A minor portion of the remaining costs has been funded through HMLP's general funds, and thus through existing rates. HMLP expects that the general funds will be reimbursed out of future collections of hook-up charges. However, hook-up charges will not be used to reimburse the general funds for expenses associated with annual system maintenance required during the time the system is being improved. HMLP estimates that such maintenance costs will comprise $500,000 of the $2,500,000 total cost of necessary improvements.

1. The Bertones view the system improvements made by HMLP as incurring extraordinary expenses for the enlargement and reconstruction of its facilities. Based on that view, they argued to the department that no specific authorization exists within the statutory scheme governing the operation of municipal lighting plants, see G. L. c. 164, §§ 34-69A (1990 ed.), for the imposition of a hook-up charge to pay for general or site-specific improvements of the type made by HMLP. The Bertones urged the department to conclude that the hook-up charge was invalid as unauthorized because, in the absence of specific statutory permission for such a charge, the funding for general system improvements should have been obtained from the depreciation fund under G. L. c. 164, § 57, or by a bond issue authorized by the town meeting under G. L. c. 164, §§ 40, 41.

As an initial matter, we think that the department appropriately characterized the hook-up charge as a matter of rate design rather than financing authority. HMLP has been empowered to "maintain and operate" a light plant, G. L. c. 164, § 55, and to have "full charge of the . . . distribution of . . . electricity . . . [and] the method, time, price, quantity and quality of supply." G. L. c. 164, § 56. Consistent with

these statutes, HMLP has broad discretion to expend money and to set rates, see *Municipal Light Comm'n of Peabody* v. *Peabody*, 348 Mass. 266, 270-272 (1964), and to determine rate practices. See *Boston Real Estate Bd.* v. *Department of Pub. Utils.*, 334 Mass. 477, 485 (1956). We have recognized the authority of municipal utilities to establish terms and conditions for service to prospective customers, see *Rounds* v. *Water & Sewer Comm'rs of Wilmington*, 347 Mass. 40, 44 (1964), and we have inferred that a municipal facility, as part of its rate-making function, may impose a hook-up charge to deal with the increasing cumulative demands of new development.[6] *Henry B. Byors & Sons* v. *Water Comm'rs of Northborough*, 358 Mass. 354, 357-358 (1970). The department could reasonably conclude on the record before it that the hook-up charge fell within HMLP's authority to structure its rates to meet costs incurred by its obligation to provide service to new customers.[7]

---

[6]Other State courts have examined statutes analogous to G. L. c. 164, §§ 55 and 56, and decided that they permit municipal utilities to impose hook-up charges. In *Hillis Homes, Inc.* v. *Public Util. Dist. No. 1 of Snohomish County*, 105 Wash. 2d 288, 298 (1986), the Supreme Court of Washington interpreted two statutes remarkably similar to G. L. c. 164, § 56, and held that under both provisions, "the imposition of a connection charge on new customers is a reasonably necessary means of effectuating the express powers granted." See *Contractors & Builders Ass'n of Pinellas County* v. *Dunedin*, 329 So. 2d 314, 318-321 (Fla.), cert. denied, 444 U.S. 867 (1976) (implicit in the power to provide municipal services is the power to impose connection fees, even though statutory scheme only expressly provided for deficit financing); *Coulter* v. *Rawlins*, 662 P.2d 888, 899 (Wyo. 1983) (same).

[7]On this issue, the department noted the following:

"This finding applies only to HMLP's authority as a municipal electric department under c. 164, §§ 34-69A. Under the statutory scheme for municipal electric departments, the Department generally defers to the ratemaking authority and policies vested by statute in the municipality unless the rates are prohibited by statute or rise to the level of unduly discriminatory. *Holyoke Water Power Co.* v. *Holyoke*, 349 Mass. 442 (1965); *Reading Municipal Light Department*, D.P.U. 85-121/85-138/86-28-F, p. 16 (1987). Accordingly, findings regarding the propriety of the hook-up fee in this case do not necessarily apply to investor-owned electric utilities, which would be governed under different provisions of Chapter 164, including the Department's general supervisory authority under § 76 and its rate-setting authority under § 94."

We also conclude that the department properly rejected the Bertones' specific arguments asserting that the hook-up charge was invalid. HMLP had authority to determine how much of its discretionary funds would be used for its development facilitation program. And, as the department concluded, HMLP was not engaged in a project that required funding through a bond issue approved by the town meeting. The resolution of this issue turned on the construction to be given to G. L. c. 164, § 41.[8] The department construed the language in the first sentence of § 41 pertaining to the reconstruction, enlargement, or extension of a municipal lighting plant, as designed to address major expansion of a plant such as would occur when the plant decides to extend its service to a new service territory. The second sentence of § 41 makes clear that the statute is not intended to apply to ordinary expenditures needed to serve new customers, or present customers with expanded service, within the plant's existing service territory where the plant has a "duty to exercise [its] franchise for the benefit of the public, with a reasonable regard for the rights of individuals who desire to be served, and without discrimination between them." *Weld* v. *Gas & Elec. Light Comm'rs*, 197 Mass. 556, 557 (1908).

HMLP was obliged to serve the Bertones' development, and the hook-up charge, in general, would be applied to new customers, or customers with expanded service, within HMLP's service territory. The charge was imposed for the connection of new electrical load to the system, and it reflected the individual service needs and location of the customer, and the incremental costs for system improvements

---

[8]General Laws c. 164, § 41 (1990 ed.), reads as follows:

"A city or town owning such a [municipal lighting] plant shall not, except by a vote taken in the manner prescribed in section eight of chapter forty-four, reconstruct, enlarge or extend such plant. This section shall not apply to expenditures for ordinary maintenance, repair or replacement, or for new equipment necessary to generate gas or electricity to new customers."

General Laws c. 44, § 8 (8) (1990 ed.), authorizes a town to incur debt outside its debt limit for the purpose of "extending or enlarging [an] . . . electric lighting plant."

attributable to the increased load caused by the customer. Thus, the department's conclusion — that resort to the hook-up charge to acquire funds for new equipment and improvements to HMLP's system did not involve the sort of project requiring financing after town meeting approval under § 41 — was reasonable, and we accept it.[9]

2. The Bertones argued to the department that the hook-up charge was unlawfully discriminatory because the charge financed capital improvements that materially benefit a large class of existing HMLP customers who were not required to pay hook-up charges. The department correctly rejected this argument.

The initial decision on rate design rested with HMLP under G. L. c. 164, § 58, and it could lawfully differentiate between classes of customers as long as the classifications were reasonable. See *Boston Real Estate Bd.* v. *Department of Pub. Utils.*, 334 Mass. 477, 495 (1956) ("That different treatment for different classes of customers, reasonably classified, is not unlawful discrimination is axiomatic in rate making"). See also *American Hoechest Corp.* v. *Department of Pub. Utils.*, 379 Mass. 408, 411 (1980).

The hook-up charge differentiated between those who sought new or expanded service after August 1, 1985, and those who connected to the system or expanded their use prior to that date. The record supports the department's conclusion that this distinction has a rational basis. In the first place, the condominium development proposed in Hull for the late 1980's would substantially increase HLMP's peak load beyond the system's capabilities, a fact which required construction of additional system facilities. It was reasonable for HMLP to conclude that existing customers who do not contribute to the surge in peak-load demand (by seeking new or expanded service) should not participate in charges to pay

---

[9]There is also nothing in G. L. c. 164, § 61, which required HMLP to obtain authorization from a town by-law before charging for site-specific hookups. That statute, by its terms, applies only during the time period in which a town is "acquiring" a lighting plant, and does not apply to the improvement of an existing electrical system to meet new needs.

for the construction. See *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 47 (1978) (rational partially to exempt from rate increase residential users not significantly contributing to growth in peak-load demand). Secondly, the hook-up fee requires that the new customers pay an amount that reasonably relates to the incremental cost of the additional facilities needed to provide them with service. Cost of service is, of course, a "well recognized basis" for rate design, *American Hoechest Corp.*, *supra* at 411, and the use of a system-wide average for incremental cost is reasonable because new customers, if viewed individually, would have a minimal impact. It is only when seen as a whole, as the sudden development in Hull reasonably could be, that the development's impact could be accurately assessed.[10] The record before the department shows that the hook-up charge paid "for only those improvements to the system . . . necessitated by the new customers, and hence [which] will benefit them alone, and the remaining improvements are paid for by rate increases imposed on all customers."[11] *Hillis Homes, Inc.* v.

---

[10] As has been indicated, the addition of 1,500 or more units in a four or five-year period, as projected, represented a drastic increase in customers. HMLP had averaged only about twenty-five new accounts per year from 1970 to 1984, and it had only 5,120 retail customers in 1986. New customers also differ from existing customers in various ways. For example, the contribution to peak demand by new units is potentially much larger than contribution by existing units; the contribution by new units is easily and inexpensively avoidable as compared to the load in existing buildings; existing residential uses are already in place, and many of the existing customers have already paid heavily toward the depreciation of HMLP's plant; existing residential (and other loads) were added in fairly small increments; and the new loads will generally be concentrated specially, and will require substantial incremental local distribution investments.

[11] The department also properly dismissed as "speculative" the Bertones' additional argument that the hook-up charge was unreasonably discriminatory because it "subsidizes" future users, namely users who request service after the development facilitation plan expenses are paid off. The argument boils down to an assertion that HMLP may have constructed slightly more capacity than it needs to serve those new customers who actually do come on line in the forecasted period. To avoid this problem completely, however, utilities would be required constantly to perform some kind of "rolling reconciliation," as HMLP suggests, to include future, but reasonably unforeseen, customers instead of being required to revise pro-

*Public Util. Dist. No. 1 of Snohomish County*, 105 Wash. 2d 288, 300 (1986).

3. The Bertones contend that the provisions for the hook-up charge are vague because they allegedly do not contain standards to determine the amount of the fee. The department rejected this argument, finding that "[t]he elements of the hook-up charge are sufficiently fixed to allow for easy calculation based on HMLP's standardized worksheets." The department's conclusion is correct.

As demonstrated by the materials in the record, HMLP calculates each applicant's charge by incorporating data on electrical load into a standardized worksheet. These data, in turn, provide for a calculation of each project's contribution to coincident peak load. Once this calculation is made, each project's contribution is multiplied by a fixed figure of $1,000 per kilowatt hour. Thus, the department correctly found that the calculation process "employ[s] . . . a definite rule or . . . mathematical process" to "elements [that] are settled." *Consumers Org. for Fair Energy Equality, Inc.* v. *Department of Pub. Utils.*, 368 Mass. 599, 605 (1975). See *Arsenault* v. *Peabody*, 6 Mass. App. Ct. 907 (1978) (municipal power plant's use of fuel adjustment clause that provides for fluctuations in unit costs of electricity according to changes in fuel prices held to be a fixed rate within the meaning of G. L. c. 164, § 58).

Despite this fixed formula, the Bertones argue that HMLP could "revise, change or alter the method of calculating hook-up charges at any time," and that therefore HMLP has "unbridled discretion" in the calculation of such fees. This argument lacks substance. General Laws c. 164, § 58, vests discretion in municipal light plants, such as HMLP, to change their charges for electricity as often as every three months. Such discretion "indicate[s] a legislative deference to the fact that [municipal light boards'] rate schedules are

spective charges as conditions and costs substantially change. This would obviously be impractical and would prevent any imposition of marginal cost-based ratemaking based on reasonably foreseeable expenditures and revenues.

fixed by 'public officers acting under legislative mandate' . . . and that therefore they do not require the close scrutiny and measure of supervision by the Department which is authorized or required as to nonmunicipal electric companies." *Gas & Elec. Comm'rs of Middleborough* v. *Department of Pub. Utils.*, 363 Mass. 433, 438 (1973), quoting *Adie* v. *Mayor of Holyoke*, 303 Mass. 295, 300 (1936). This discretion, however, is circumscribed by, among other considerations, the specific rate design restrictions in G. L. c. 164, § 58, the requirement that rates be filed with the department, G. L. c. 164, § 59, and the department's supervisory power to review such rates as set forth in G. L. c. 164. See, e.g., *Municipal Light Comm'n of Peabody* v. *Peabody*, 348 Mass. 266, 268-273 (1964). The Bertones are wrong in their contention that HMLP has unlimited discretion to alter the formula by which the fee is calculated.

4. The Bertones also argue that the hook-up charge constitutes a tax which HMLP lacks the authority to assess. This argument was made only obliquely to the department. The record, however, is sufficiently developed to permit us to deal with the issue, and in the interest of resolving the dispute without further proceedings we shall decide it. We conclude that the hook-up charge is in the nature of a fee which HMLP could lawfully charge.

In *Emerson College* v. *Boston*, 391 Mass. 415, 424-425 (1984), we observed that "fees share common traits that distinguish them from taxes: they are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner 'not shared by other members of society,' . . . ; they are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge . . . , and the charges are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses" (citations omitted). See *Southview Coop. Hous. Corp.* v. *Rent Control Bd. of Cambridge*, 396 Mass. 395, 400-404 (1985). We apply each of these factors to the hook-up charge.

As to the first factor, the hook-up charge is assessed only to new customers (including existing customers seeking expanded service) who benefit from new or additional use of HMLP-supplied electricity after August 1, 1985. These services are "sufficiently particularized" to justify distributing their costs among the new customers only, and not to all customers. *Emerson College, supra* at 425. The benefit of new or expanded service (including both the service itself and the new construction which make it possible) is conferred only on those who connect to the system after August 1, 1985. The fact that system improvements will also serve existing HMLP customers is not significant because, so far as the record shows, the product received and paid for by those customers — electrical service — remains unchanged (unless they seek expanded service, in which case they must pay a hook-up charge).[12] Thus, the new customers benefit in a manner not shared by existing customers.

The second and third factors of the *Emerson College* test are also satisfied. The Bertones and other new customers are not "compelled" to pay the fee. Compare *Emerson College, supra* at 426 (fee imposed on owners of existing buildings). The charges are only imposed on those choosing to use (for the first time), or expand their use of, HMLP's electrical service. The Bertones' argument, that the only way they could avoid the charge was to relinquish their right to develop the land, does not affect this conclusion. Fees are not taxes "even though they must be paid in order that a right may be enjoyed." *Southview Coop. Hous. Corp., supra* at 402. See *Winthrop* v. *Winthrop Hous. Auth.*, 27 Mass. App. Ct. 645, 647 (1989).

Further, the revenues received from the hook-up charges are reasonably calculated to meet expenses incurred in pro-

---

[12]It was for the Bertones to prove any benefit to existing customers. See *Southview Coop. Hous. Corp., supra* at 403. The record does not show any apparent improvement in service to existing customers, although there is a possible correction (costing $18,000) required to comply with a New England Power Pool directive. This incidental "benefit" is plainly de minimis.

viding electric service to new customers. See *Southview Coop. Hous. Corp.*, *supra* at 403 (noting that "reasonable latitude" must be given in reviewing calculation of charges). The revenues are not added to a general fund for providing service to all but rather are targeted to the newly required construction. That the hook-up fees may reimburse HMLP for amounts expended on new construction, but initially paid from general funds derived from rates, does not change this fact. See *id.* at 404 (that fee will substitute for funds otherwise raised by taxes not relevant). "Proprietary fees do not implicate the taxation power if 'based on fair recompense for the public moneys expended for initial construction and for adequate maintenance' of the facilities used." *Emerson College*, *supra* at 425 n.16, quoting *Opinion of the Justices*, 250 Mass. 591, 597 (1924). The hook-up charge is in this category; it does not constitute a tax.

The order of the department granting HMLP summary judgment is affirmed.

*So ordered.*