## DENVER STREET LLC *vs.* TOWN OF SAUGUS
### (and three companion cases[1]).

No. 09-P-2031.

Essex. September 15, 2010. - January 6, 2011.

Present: DUFFLY, SIKORA, & MILKEY, JJ.

Further appellate review granted, 459 Mass. 1104 (2011).

*Constitutional Law,* Taxation. *Taxation,* Sewer assessment. *Municipal Corporations,* Sewers. *Sewer. Damages,* Interest.

In an action brought in Superior Court by four developers and landowners, alleging that the inflow and infiltration reduction contribution (contribution) each was required to make in order to connect to the town's sewer system constituted an illegal tax rather than a permissible fee, the judge did not err in ruling in favor of the plaintiffs, where new sewer users such as the plaintiffs received no benefits that were not shared by other members of the town [531-534], and where the amount of the contribution was not reasonably related to the cost of services from which the new users alone derived a benefit [534-536].
A trial court judge did not err in calculating interest on an award of damages. [536-538]

CIVIL ACTIONS commenced in the Superior Court Department on November 8, 2005, December 9, 2005, and May 26, 2006.

After consolidation, the cases were heard by *Frances A. McIntyre,* J.

*Ira H. Zaleznik (Kristina A. Engberg* with him) for town of Saugus.

*James R. Senior* for Denver Street LLC & others.

*John L. Davenport,* for Conservation Law Foundation, Inc., amicus curiae, submitted a brief.

DUFFLY, J. For a number of years, the town of Saugus (town) coped with its failing sewer infrastructure by releasing water

---

[1]Paul DiBiase, as trustee of Oak Point Realty Trust *vs.* Town of Saugus; Kevin Procopio, as trustee of Vinegar Hill Estates Trust *vs.* Town of Saugus; and Central Street Saugus Realty, LLC *vs.* Town of Saugus.

and sewage into the Saugus River. In 2005, the town entered into an administrative consent order (ACO) with the Department of Environmental Protection (DEP) that mandated repairs to reduce the amount of groundwater inflow and infiltration (I/I) into the system. The four plaintiffs, Denver Street LLC (Denver Street), Paul DiBiase, as trustee of Oak Point Realty Trust (Oak Point), Kevin Procopio, as trustee of Vinegar Hill Estate Trust (Vinegar Hill), and Central Street Saugus Realty, LLC (Central Street), are developers and landowners who sought permits for residential construction in the town. The town required the plaintiffs to connect to the town sewer system and charged them an I/I reduction contribution, termed a "fee" by the town, which they paid under protest. The plaintiffs thereafter filed separate complaints in Superior Court that set forth substantially similar allegations that the I/I reduction contribution each was required to make in order to connect to the town's sewer system constituted an illegal tax rather than a permissible fee. The plaintiffs sought refunds of these payments.[2] Vinegar Hill also sought declaratory relief. The complaints were consolidated, and the matter proceeded to trial without a jury.

The trial judge determined that the I/I reduction contribution was not an allowable fee but an illegal tax. Judgments issued in favor of each of the plaintiffs ordering the town to refund the amount of the I/I reduction contribution each had paid, plus fees and costs. Prejudgment interest at the rate of twelve per cent was added to each of the awards.[3]

On appeal, the town's challenge to the judge's conclusion

---

[2]Denver Street paid and sought a refund in the amount of $244,200, in connection with its development of a multifamily residential project containing seventy-four bedrooms; Oak Point paid and sought a refund in the amount of $115,500, in connection with its development of a single-family home and a sixteen-unit residential project; Vinegar Hill paid and sought a refund in the amount of $73,160, in connection with its partial development of a forty-six lot residential subdivision; and Central Street paid and sought a refund in the amount of $237,600, in connection with its development of a seventy-two bedroom multifamily residential project.

[3]The judge granted Vinegar Hill's motion, filed pursuant to Mass.R.Civ.P. 59(e), 365 Mass. 827 (1974), to amend the declaratory judgment. The amended judgment declares "[t]hat the I/I Reduction Contribution does not constitute a valid fee but is rather an unlawful tax and the Town of Saugus may not require the plaintiff Vinegar Hill Estates Trust to pay it as a prerequisite to the issuance of sewer permits."

that the I/I reduction contribution constituted an illegal tax focuses on claims that (i) the new users received a particularized benefit, and (ii) the payments bore a reasonable relationship to the costs of sewer system repairs. The town also claims that it was error to impose a twelve percent rate of interest as provided by G. L. c. 231, § 6H.[4] We affirm.[5]

*Facts.* We summarize the judge's comprehensive findings and the uncontested facts of record. *Millennium Equity Holdings, LLC* v. *Mahlowitz*, 456 Mass. 627, 630 (2010). The town has had trouble with its sewer system for many years, with official documents in the record indicating recognition of this fact at least as far back as 1986. Central to the issues in this appeal is the town's degraded or inadequate sewer infrastructure, which allowed water to enter the sewer system and occasionally to overload it.[6] Overloading occurs when ground water leaks into the sanitary sewer system through defective pipes, pipe joints, and sewer connections (infiltration), or when rain or other extraneous sources of water enter the system from public sources such as manhole covers and private sources such as sump pumps and roof drains (inflow). I/I increases the volume of liquid in the sewer system, which can result in sewage overflows when excessive amounts of I/I caused by storm events push the system to or beyond its capacity. Prior to 2005, during overflow events, in order to prevent sewage from backing up into homes and businesses linked to the sewer system, the town discharged

---

[4]The town also claims that one finding of the trial judge was not grounded in the evidence, and it filed a motion to amend findings pursuant to Mass.R. Civ.P. 52(b), as amended, 423 Mass. 1402 (1996). That motion was denied. See note 16, *infra*.

[5]We acknowledge the amicus brief filed by the Conservation Law Foundation, Inc.

[6]As recited in the ACO, "In 1997, the Town hired a consultant to evaluate its sewer system. This evaluation identified numerous deficiencies in the sewer system including leaking manholes, mainlines and service lines, defective manholes, uncapped cleanouts, sewer pipes with blockages. The Town also identified illegal connections of sump pumps, driveway drains, and storm drains to the sewer system. . . . The defects in the Town sewer system allow excessive amounts of infiltration and inflow to enter the sewer system. This infiltration and inflow results in sanitary sewer overflows to the Saugus River and contributes to the surcharging of the Lynn system which during wet weather experiences combined sewer system overflows to the Saugus River and ocean." The trial judge found that, pursuant to an agreement with the city of Lynn, the town sewer system collects sanitary waste and pumps it to Lynn for treatment.

untreated sewage directly into the Saugus River, which flows through Rumney Marsh, an "Area of Critical Environmental Concern," and from there to the ocean.

Repeated discharges of sewage into an environmentally sensitive area brought the scrutiny of the DEP, which in 2004 instituted administrative proceedings against the town for its asserted violations of the Clean Waters Act, G. L. c. 21, § 43(2), and related Massachusetts regulations governing operation and maintenance of wastewater treatment works and indirect dischargers. 314 Code Mass. Regs. § 12.03(8) (2002). 314 Code Mass. Regs. § 12.04(8) (1996). In 2005, to resolve the administrative action, the town entered into the ACO with the DEP, which required the town to implement plans to identify and eliminate sources of I/I as a condition of allowing new wastewater discharges to the sanitary sewer system.[7]

In accordance with the ACO, the town instituted a moratorium on any new construction that would affect the sewer system until such time as a plan was implemented that successfully addressed the I/I problems leading to overflow into the river. As further required by the terms of the ACO, the town created and implemented an "Inflow and Infiltration Reduction Program Sewer Connection and Extension Policy" (SCEP) and a mechanism for calculating when I/I reduction was such that new flow would be permitted. That mechanism, called the "sewer bank," has been in use in a number of other cities and towns in the Commonwealth.

Under the sewer bank procedure, applicants seeking to connect to the sewer system could "purchase" gallons of flow from the sewer bank by making an I/I reduction contribution. The procedure is in essence a means of record-keeping that enables the town and the DEP to keep track of total gallons of I/I flow remediated. As repairs by the town were completed, I/I would be removed from the system. The I/I removed, measured in gallons, would result in a credit to the sewer bank of a specified

---

[7]As recited in the ACO: "The Town has installed a bypass pump that discharges raw sewage into the Saugus River to avoid backups into basements." During specified dates in 1998 and 2001 through 2004, "the Town notified the [DEP] of sanitary sewer overflows at the Lincoln Avenue pumping station." During a DEP inspection in September, 2004, it was observed that "raw sewage had recently overflowed from the pumping station."

number of gallons of flow. In accordance with the formula set forth in the ACO, the town initially was permitted to add one gallon of flow to the sewer bank for every ten gallons of I/I removed from the sanitary sewer system. These credits could then be, but were not required to be, allocated to new construction. As the town successfully removed I/I-related flow from the system, that is, when the total I/I removal reached 250,000 gallons, this 10:1 ratio would drop to 6:1; when I/I removal reached 500,000 gallons, the ratio would drop to 4:1.[8]

The town was prohibited from issuing permits for new sewer connections unless there were, at the time, sufficient gallons in the sewer bank to meet the new needs. The sewer bank approach was adopted to permit incremental remediation of the problem while allowing new connections to the system. As the town embarked on a multiyear project to make repairs to the system that would result in reduction in I/I, it handled permits for new construction in the following manner: Once a sufficient number of credits had accumulated in the sewer bank under the formula set forth in the ACO, a developer seeking to connect to the sewer system (required by the town for all development of commercial or residential properties) paid an I/I reduction contribution (a monetary amount that was paid in addition to a building permit fee and a plumbing fixture fee). The I/I reduction contribution was initially calculated by multiplying by a factor of ten the number of gallons of new sewer flow proposed to be generated by the project and discharged to the sewer system,[9] and then multiplying that number by three dollars.[10] The factor of ten was reduced by the town to six in January, 2007, and to four in December, 2007.

[8]The parties have stipulated that the town made sufficient I/I repairs to reduce the ratio to 6:1 in August, 2005, and to 4:1 at the beginning of 2006. It is apparent from the record that the town did not implement the first reduction until nearly two years later, in January, 2007, and the second in December, 2007.

[9]The judge found that, in calculating the amount of proposed flow to be discharged to the sewer system, the town relied on, among other documents, the State sanitary code, which assigns gallonage to certain components of the project, e.g., gallons per bedroom or per fixture, which in turn is used to predict a standard anticipated flow from a given development.

[10]The three dollar figure represented "an estimate" of the costs to perform I/I-mitigating repairs, which was based on industry practice and the project coordinator's prior experience.

The ACO did not require that any particular applicant for a sewer connection permit remove I/I, nor did it require that such an applicant pay an I/I reduction contribution. The judge found there to be "no relationship between the amount of the calculated I/I [reduction] [c]ontribution and the actual cost to the Town . . . for labor and materials necessary to make the physical connection to the sanitary sewer system." She further found that "the Town was obligated to reduce I/I whether new users were added to the system or not. The I/I problem was not caused by, or exacerbated by[,] the new users. In other words, the I/I and the [sanitary sewer overflow] problems existed independently of the requirements of new users."

*Discussion.* 1. *Claim that charges are permissible fees.* "A municipality does not have the power to levy, assess, or collect a tax unless the power to do so in a particular instance is granted by the Legislature." *Silva* v. *Attleboro*, 454 Mass. 165, 168 (2009), quoting from *Commonwealth* v. *Caldwell*, 25 Mass. App. Ct. 91, 92 (1987). See art. 2 of the Amendments to the Massachusetts Constitution, as appearing in art. 89, §§ 1, 6, and 7 ("Cities and towns have no independent power of taxation"). "Towns may, however, exact fees." *Greater Franklin Developers Assn., Inc.* v. *Franklin*, 49 Mass. App. Ct. 500, 502 (2000), citing G. L. c. 40, § 22F. The plaintiffs claim that I/I reduction contributions constitute an illegal tax because they were not authorized by the Legislature; the town argues that the charges are a permissible fee under G. L. c. 40, § 22F.

In determining whether the charges constitute a permissible fee, we consider the three-factor test set forth in *Emerson College* v. *Boston*, 391 Mass. 415, 424-425 (1984) (*Emerson College*). "Fees imposed by a governmental entity . . . share common traits that distinguish them from taxes: [1] they are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner 'not shared by other members of society'; [2] they are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge, . . . and [3] the charges are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses." *Ibid.*, quoting from *National Cable Television Assn.* v. *United States*, 415 U.S. 336, 341 (1974).

We focus on the first and third factors, the parties having stipulated that the plaintiffs have a choice whether to pay the I/I reduction contribution, because they could choose not to develop property requiring sewer connections. See *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgmt. Bd.*, 421 Mass. 196, 206 (1995).[11] In our review, we bear in mind that we will "accept the judge's findings of fact unless there is clear error. . . . However, 'we scrutinize without deference the legal standard which the judge applied to the facts.' " *Silva* v. *Attleboro*, 454 Mass. at 167-168, quoting from *Kendall* v. *Selvaggio*, 413 Mass. 619, 621 (1992).

(a) *Specific benefit.* There is ample support in the record for the judge's findings and conclusions that, under the first *Emerson College* factor, the I/I reduction contribution does not benefit the fee payers in a manner not shared by others and is better characterized as a tax. In *Emerson College*, the city of Boston passed an ordinance that imposed a fee on owners of certain buildings that "by reason of their size, type of construction, use and other relevant factors" required the city to augment its fire protection services. 391 Mass. at 416. Because of the physical characteristics of its buildings, Emerson College, a tax-exempt entity, was subject to a sizeable payment, and it sought a declaratory judgment that the charges mandated by the ordinance constituted an illegal tax. The court agreed, stating that the college was not the only beneficiary of the augmented protection but that the entire community benefited, because "the prevention of damage to buildings by fire is an object which affects the interest of all the inhabitants and relieves them from a common burden and danger." *Id.* at 426, quoting from *Fisher* v. *Boston*, 104 Mass. 87, 93 (1870). See *Greater Franklin Developers Assn., Inc.* v. *Franklin*, 49 Mass. App. Ct. at 502-503 (benefit of new school facilities accruing to individual children, and through them to actual fee payers, is not particularized).

---

[11]The court in *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgmt. Board*, 421 Mass. at 205-206, discussed the meaning of "choice," as distinct from "free choice," as that word is utilized in cases addressing the factors set forth in *Emerson College, supra.* The court cited *Bertone* v. *Department of Pub. Util.*, 411 Mass. 536 (1992), as providing an example of choice. In *Bertone*, the choice presented to the plaintiffs was the same as that facing the plaintiffs here, to forgo the development of their property. *Id.* at 549.

We applied this factor in *Berry* v. *Danvers,* 34 Mass. App. Ct. 507, 508 (1993) *(Berry),* concluding that the fee imposed by the town of Danvers on landowners seeking to connect to the common sewer system, or to increase usage by an existing connection, was an illegal tax. Through adoption of a sewer connection permit program (SCPP), Danvers increased sewer connection fees from a flat fee per connection to a fee of four dollars for each gallon of sewage to be discharged daily. *Id.* at 507-508. Danvers's sewer system experienced problems with I/I that contributed to sewage overflow "to the point where a heavy rainfall would result in lifted manhole covers and overflow of sewage into streets, yards, and nearby streams and rivers." *Id.* at 509.

We disagree with the town that *Berry, supra,* may be distinguished by the fact that Danvers faced actual backflow of sewage into residences and streets during overflow situations, in contrast to the situation here, where (the town argues) actual backflow of sewage into homes was averted.[12] This is a distinction without a difference. The town was acutely aware of the potential for backflow when it discharged untreated sewage into the Saugus River in order to prevent sewage from backing up into homes and businesses linked to the sewer system. As we stated in *Berry, supra* at 511, in addition to benefiting "current users, whose streets and yards were periodically covered with raw sewage after a heavy rain . . . , the repair of the dilapidated existing system under the SCPP was of primary utility to those already connected to it and inconvenienced by its inadequacies."

Here, as in *Berry,* every inhabitant of the town (as well as those living in the downstream communities bordering the Saugus River and beyond) benefited from I/I repairs to the dilapidated

---

[12]The judge's findings belie the claim that no backflow of sewage into residences and streets occurred in the town. As the judge found, "In one instance in December 1996, the Town reported to DEP that houses on 85 streets had been affected by sewage backups into basements, with manholes overflowing on those streets. Close to twenty overflows and discharge emergencies were reported over 19 years." She further found that the engineer hired by the town as project manager in its I/I remediation efforts "had a role in the Route One sewer problem. Near [a] restaurant at the Main Street area, the engineers discovered that sewage in a sewer pipe had risen to the level of the road surface." She also found, "Reduction of I/I also generally benefited the larger community in that there were *fewer occasions of raw sewage in homes* and less environmental impact, such as the destruction of shellfish beds" (emphasis added). See note 7, *supra.*

sewer system. Not only was sewage overflow onto streets and into residences averted, but with each repair, sewage discharge into the environmentally sensitive river and nearby ocean became less likely, with resulting environmental and health benefits extending to all inhabitants of the town. See *Shea* v. *Boston Edison Co.*, 431 Mass. 251, 259 (2000) (not a fee where general public receives "spillover" benefits from energy efficiency programs supported by the charges at issue).[13]

(b) *Reasonable relationship to costs of specific service.* To constitute a permissible fee under the third *Emerson College* factor, "the charges [must be] collected not to raise revenues but to compensate the governmental entity providing the services for its expenses." 391 Mass. at 425.

The I/I reduction contribution did not compensate the town for services related to expenses it incurred in connection with the entry of new users to the sewer system. We disagree that *Bertone* v. *Department of Pub. Util.*, 411 Mass. 536, 539 (1992) (*Bertone*), supports the town's view that the I/I reduction contribution is a permissible fee because it bears a reasonable relationship to the costs of reducing I/I.

In *Bertone*, the court determined that the town of Hull could permissibly assess a hook-up charge from those seeking new or expanded electrical service. In *Berry*, we distinguished the hook-up charge from the sewer connection permit program fee, noting that the hook-up charge was "an amount that reasonably relates to the incremental cost of the additional facilities needed to provide them with service . . . [and] paid 'for only those

---

[13]We also reject the town's argument that new users received a particularized benefit for payment of the I/I reduction contribution in the form of accelerated access to the sewer system. As we said in *Berry*, 34 Mass. App. Ct. at 510-511, "[w]hile removal of I/I would theoretically benefit new users by freeing up additional capacity and allowing them to connect to the sewer system, it would provide as much or greater benefit to current users." Likewise here, the I/I payments were not necessitated by the new or increased access to the sewer system. Even without I/I reduction contributions from new users, the repairs would have been required, albeit funded from other sources such as higher sewer fees for all users. It may well be, as the town suggests, that the I/I reduction contributions from new users made possible more rapid completion of the I/I repairs mandated by the ACO, and that new users could therefore take advantage of sewer bank credits earlier. But an advantage was shared by all inhabitants of the town and surrounding areas, who could sooner enjoy the benefits of decreased sewage overflow events.

improvements to the system . . . necessitated by the new customers, and hence . . . will benefit them alone, and the remaining improvements are paid for by rate increases imposed on all customers.' " 34 Mass. App. Ct. at 511, quoting from *Bertone*, 411 Mass. at 546. The funds generated by the hook-up charge in *Bertone* were used to make changes to and improvements in the town's electrical infrastructure, without which it would not have been possible for the plaintiffs and thousands of other anticipated new users to connect to Hull's electrical supply system. 411 Mass. at 544-545. The existing system did not require out-of-the-ordinary repairs or modifications, and only those seeking to undertake new development of property or to expand electrical service would benefit from the changes. *Id.* at 546. The hook-up charges did not constitute a tax because "the revenues received from the hook-up charges are reasonably calculated to meet expenses incurred in providing electric service to new customers. . . . The revenues are not added to a general fund for providing service to all but rather are targeted to the newly required construction." *Id.* at 549-550. See *Silva* v. *Attleboro*, 454 Mass. at 169 (although "municipality has no independent power of taxation, it may assess, levy, and collect fees when authorized by Legislature, provided that those fees are reasonable and proportional").

The I/I reduction contribution is not so limited in its benefits and thus constitutes an illegal tax. The I/I repairs that resulted in credits to the sewer bank were mandated by the DEP to rectify existing environmental problems, regardless of any benefit to new sewer system users and irrespective of whether any new users would take advantage of the credits and pay the I/I reduction contribution. There is ample evidence in the record to support the judge's finding that "[t]he I/I problem was not in any way triggered by or aggravated by new users to the system. But for the I/I problem, the [town's] sewer system would *not* have required renovation in order to accommodate the new users. The contribution does not go to new infrastructure, but only goes to repair an existing system."[14]

We also reject the town's argument that the I/I reduction

---

[14]That the I/I reduction contribution bears a reasonable relationship to the cost of the repairs necessary to create sewer bank credits is refuted by the fact

contribution is a fee because it is specifically designated as such, it is calculated based on best estimates of the cost of I/I repair, and the funds are kept in a separate interest-bearing fund "earmarked for the sole purpose of addressing I/I problems." As further reflected in the judge's findings, and as supported by the record, the town has a sewer enterprise fund which is funded through the payment of the sewer rates by sewer users generally. The I/I reduction contributions are deposited into a separate fund established for those contributions. The town transferred a total of $440,000 from the I/I fund to the sewer enterprise fund, primarily to pay for repairs to the Lynnhurst pumping station and the repair of a sewer line on Route 1, performed in January, 2006.[15] There was no I/I associated with the pumping station, and no gallons were credited to the sewer bank as a result of repairs to it. The repairs to the pumping station "were not done to eliminate I/I."[16]

Because new sewer users received no benefits that were not shared by other members of the town, and the amount of the I/I reduction contribution was not reasonably related to the cost of services from which the new users alone derived a benefit, the I/I reduction contribution was an illegal tax and not a fee.[17]

2. *Applicable interest rate.* The trial judge applied a twelve

that although the initial I/I payment was calibrated at the 10:1 ratio, to compensate for the estimated cost of creating a gallon of credit in the sewer bank, when subsequent I/I repairs made it possible under the terms of the ACO and SCEP to lower the ratio to 6:1 and then to 4:1, there was no concomitant reduction in the I/I payment assessed those seeking new sewer connections. The 10:1 ratio remained in effect for almost two years after the ratio could have been lowered under the terms of the ACO and SCEP. See note 8, *supra.* The additional revenues generated were in excess of the cost of creating sewer bank credits and were a benefit to the town and its taxpayers.

[15]The Route 1 repairs did eventually result in some I/I reduction. However, the repairs were undertaken to address an emergency, see note 12, *supra,* not to reduce I/I, and the cost of the work that produced I/I repair was estimated to comprise less than ten percent of the total cost.

[16]The town argues that because the Lynnhurst pumping station pump handled system flow that was in part the result of I/I, the repairs to the pump were therefore related to I/I, and use of the money in the fund was appropriate. But by the same logic, repairs to the sewer system of any kind would qualify as related to I/I, because flow caused by I/I moves through the sewer system.

[17]We do not address the town's claim, not raised below, that because the SCEP was (as alleged by the town) produced according to a mandate from a State agency, the I/I reduction contribution is more akin to a fee. The town

percent interest rate to the amounts awarded to the plaintiffs. The town argues that an interest rate of twelve percent was error, where the rate is authorized only under G. L. c. 231, § 6B (tort), § 6C (contract) and § 6H, which provides for interest at the rate of twelve percent "[i]n any action in which damages are awarded, but in which interest on said damages is not otherwise provided by law." The town argues that the sums awarded to the plaintiffs were a refund, and thus the actions did not sound in tort or contract, and the award was not for damages.[18]

The town's reliance on *116 Commonwealth Condominium Trust* v. *Aetna Cas. & Sur. Co.*, 433 Mass. 373, 376 (2001), is misplaced. That case involved interpretation of a directors and officers liability endorsement to a general liability insurance policy. The court rejected the claim of the plaintiff trust that the policy's coverage for loss incurred by suits for "damages" included an equity action that sought preliminary and injunctive relief (that would allow access to an adjoining unit and common areas in the condominium) but did not request monetary damages.

Our courts have consistently defined "damages" as "the word which expresses in dollars and cents the injury sustained by a plaintiff. It includes both the original debt or damage and whatever interest ought to be added to make a just verdict." *Turcotte* v. *DeWitt*, 333 Mass. 389, 392 (1955). See *116 Com-*

cites to no persuasive or relevant authority for this proposition, see *Karellas* v. *Karellas*, 61 Mass. App. Ct. 716, 720 n.6 (2004), and we need not address arguments made for the first time on appeal. See *Mullins* v. *Pine Manor College*, 389 Mass. 47, 63 (1983). As we have noted, it appears from the text of the ACO that the DEP had no interest in the manner in which the town chose to fund its I/I repairs; its interest was only in the expeditious completion of these repairs.

[18]The town makes no argument that any portion of the I/I reduction contribution specifically related to each plaintiff's costs of accessing the sewer system and thus should not be included in the damages. This may be because any particularized costs of the sewer connection appear to have been included in a separate plumbing fixture fee that was in addition to a flat hook-up fee of $125. For example, Denver Street paid and sought a refund of an I/I reduction contribution in the amount of $244,200; Denver Street also was required to pay a plumbing fixture fee of $34,000. Oak Point had two properties that it sought to develop: in connection with a single family residence on Sharon Drive, Oak Point paid an I/I reduction contribution in the amount of $9,900 and a plumbing fixture fee of $1,400.

*monwealth Condominium Trust* v. *Aetna Cas. & Sur. Co.*, 433 Mass. at 376-377 & n.3, and cases cited therein. See also *Rood* v. *Newberg*, 48 Mass. App. Ct. 185, 195 (1999), quoting from *Conway* v. *Electro Switch Corp.*, 402 Mass. 385, 390 (1988) ("It is a 'fundamental proposition that interest is awarded to compensate a damaged party for the loss of use or the unlawful detention of money' "). By any of these definitions, the plaintiffs were damaged when they were required to pay monetary sums to the town which the town could not legally charge and for so long as they were deprived of the use of those funds.[19]

The judgments dated March 18, 2009, in favor of Denver Street and Central Street, the corrected judgment dated March 20, 2009, in favor of Oak Point, and the amended declaratory judgment dated May 12, 2009, in favor of Vinegar Hill, are affirmed.

*So ordered.*

---

[19]The six percent rate proposed by the town under G. L. c. 107, § 3, provides a default interest rate for bonds and securities and is inapplicable here.