CARLTON P. BERRY, trustee, & another,[1] *vs.* TOWN OF
DANVERS & another.[2]

No. 91-P-893.

Essex. December 16, 1992. - May 20, 1993.

Present: PERRETTA, SMITH, & LAURENCE, JJ.

*Sewer. Municipal Corporations*, Sewers, Fees. *Practice, Civil*, Class
action.

A Superior Court judge correctly concluded that a sewer connection "fee"
was an unlawful real property tax, where the benefits of paying the
charge were not sufficiently particularized to the new connectors, where
the charge was not voluntary, and where the payments were deposited
in the general fund and were not earmarked for sewer improvements
and capacity expansion. [509-513]
In an action challenging the lawfulness of a sewer connection fee, the
judge did not abuse her discretion in denying the plaintiff's class action
certification motion where the judgment, ordering refunds or abate-
ments of sewer connection charges to the finite number of other persons
or entities that had paid the fee, was an appropriate and rational reme-
dial alternative to certification of a class. [513-515]

CIVIL ACTION commenced in the Superior Court Depart-
ment on September 2, 1988.

The case was heard by *Barbara A. Dortch*, J., on a motion
for summary judgment.

*Paul L. Kenny*, Town Counsel (*David J. Doneski*, Assis-
tant Town Counsel, with him) for the defendants.

*Lisa Stern Taylor* for the plaintiffs.

LAURENCE, J. In April, 1987, the Danvers water and sewer
commission adopted a Sewer Connection Permit Program
(SCPP). A principal feature of the SCPP was an increase of
the sewer connection fee (from a flat $10 per connection to a

[1]Mary Anne Cerat, who, with Carlton P. Berry, is a trustee of the
Portside Realty Trust.
[2]The water and sewer commission of the town.

rate of $4 for each gallon of sewage to be discharged daily) to be paid by landowners seeking to connect to the common sewer system or to increase usage by an existing connection. The plaintiffs, trustees of the Portside Realty Trust (Portside), paid $58,000 pursuant to the SCPP to connect seven condominium buildings they were developing to the Danvers system. Portside commenced an action in September, 1988, against the town and the sewer commission, on behalf of themselves and "all landowners who have applied for and paid for a sewer connection permit, pursuant to the SCPP." Portside's principal claim was that the SCPP charge constituted an unlawful tax and that it was entitled to a refund of all payments it had made under the SCPP. A judge of the Superior Court granted Portside's motion for summary judgment on April 22, 1991, on the ground that the SCPP was an unlawful tax; but the judge denied Portside's subsequent motion to certify the proceeding as a class action. The defendants appeal from the grant of summary judgment, while Portside cross appeals from the denial of class action certification. We affirm both rulings.

1. *Background.*[3] In 1964, as an initial step in preparing to apply for State and Federal grants to overhaul its suspect sewers, the town hired an engineering firm to evaluate the condition of the town's existing system. The firm verified the town's fear that the system had infiltration and in-flow (I/I) difficulties, which contributed to a sewage overflow problem.[4]

---

[3]The judge determined that the material facts were not in dispute when she ruled on Portside's summary judgment motion, and this background discussion is taken from the judge's memorandum of decision. In their main and reply briefs, the defendants have alluded to several supposed factual disputes. The alleged disputes, however, do not appear to have been brought to the attention of the judge in connection with the summary judgment motion. Nor have they been adequately argued on appeal as a basis for reversing the summary judgment. They are therefore not properly before us. See *Langlitz* v. *Board of Registration of Chiropractors*, 396 Mass. 374, 376 n.2 (1985); *Century Fire & Marine Ins. Corp.* v. *Bank of New England-Bristol County, N.A.*, 405 Mass. 420, 421 n.2 (1989).

[4]Infiltration is groundwater that leaks into a sewer system through defective pipes, pipe joints, and sewer connections. In-flow is extraneous water that enters a sewer system from public sources such as manhole covers and from private sources such as roof drains and sump pumps. Both

Three further studies, in 1980, 1984, and 1987-1988, confirmed that the I/I problem originally diagnosed in 1964 continued to affect the town's sewer system, to the point where a heavy rainfall would result in lifted manhole covers and overflow of sewage into streets, yards, and nearby streams and rivers.

In 1986, the engineering firm issued a preliminary draft report on a master plan for the identification and reduction of I/I, founded upon an analysis of deficiencies in several areas of the town's sewer system. That report became the basis for the SCPP authorized by the sewer commission in April, 1987. The firm calculated a connection "fee" of $4 for each gallon of sewage estimated to be discharged daily. This fee was based on an estimated cost of $2 to remove each gallon of I/I from the system and the engineer's theory that, for each gallon per day of waste water added to the system by "new" users, two gallons of I/I should be removed to allow for technical inefficiencies and future capacity. The connection payments were to be expended "to ensure proper operation of the sewer system within the Town generally" and, additionally, to reduce I/I flows to the limits required by an order of the then Department of Environmental Quality Engineering (now Department of Environmental Protection), to provide for the structural integrity of the existing conduits, and to ensure available capacity for existing and future connections to the sewer system.

2. *Validity of the summary judgment.* In the absence of any disputed issue of material fact, the defendants must "demonstrate some error of law . . . for this court to overturn the [summary judgment] order of the trial judge." *Federal Deposit Ins. Corp.* v. *Csongor,* 391 Mass. 737, 740 (1984). The defendants' essential argument is that the judge erroneously applied the principles set out in *Emerson College* v. *Boston,* 391 Mass. 415 (1984), in analyzing whether the SCPP connection charge was a legitimate fee under the town's police power or an unconstitutional real property tax.

---

infiltration and in-flow increase the volume of liquid in a sewer system, which can lead to overburdening and sewage overflow.

See *Commonwealth* v. *Caldwell*, 25 Mass. App. Ct. 91, 92 (1987). We see no error.

The *Emerson College* decision established not only that labeling such a charge a "fee" is not determinative — "the nature of a monetary exaction 'must be determined by its operation rather than its specially descriptive phrase,'" 391 Mass. at 424 — but also that a legitimate fee is to be distinguished from an improper tax by three characteristics.[5] Most significantly, it must be a charge for an essentially private rather than public benefit. A fee is

> "charged in exchange for a particular governmental service which benefits the party paying the fee in a manner 'not shared by other members of society . . . . Fees are legitimate to the extent that the services for which they are imposed are sufficiently particularized as to justify distribution of the costs among a limited group (the 'users,' or beneficiaries, of the services), rather than the general public."

*Emerson College* v. *Boston*, 391 Mass. at 424, 425.

The judge correctly determined that the benefits of the SCPP — which was explicitly designed "to ensure proper operation of the [existing] sewer system" — were not, and were not intended to be, particularized to the new connectors charged with its cost. While removal of I/I would theoretically benefit new users by freeing up additional capacity and

---

[5]*Emerson College* involved the imposition of a charge by the city of Boston, pursuant to legislative authorization, upon owners of certain types of buildings deemed to require "augmented fire [protection] services" and therefore to consume a disproportionate share of the city's firefighting budget. The charge was designed to compensate the city for the cost of providing "augmented" firefighting capability and had to be paid by the targeted owners whether or not any fire services were actually utilized to battle fires in their buildings. The Supreme Judicial Court found that the charge failed to satisfy any of the three key criteria for distinguishing a valid fee from an illegal tax, since (1) the benefits of extra fire protection were not sufficiently confined to the burdened owners, (2) the payments were not voluntary, and (3) the payments appeared to generate revenues because they were earmarked for general police and fire services, not merely extra fire protection.

allowing them to connect to the sewer system, it would provide as much or greater benefit to current users, whose streets and yards were periodically covered with raw sewage after a heavy rain. Moreover, the repair of the dilapidated existing system under the SCPP was of primary utility to those already connected to it and inconvenienced by its inadequacies. Compare *Emerson College* v. *Boston*, 391 Mass. at 425-426 (the benefits of "augmented" fire protection, supposedly required by the peculiar problems of certain buildings, were not sufficiently particularized to the owners of the assessed buildings, because "[t]he capacity to extinguish a fire in any particular building safeguards not only the private property interests of the owner, but also the safety of the building's occupants as well as that of surrounding buildings and their occupants"). Contrast *Commonwealth* v. *Caldwell*, 25 Mass. App. Ct. at 95-96 (mooring fee instituted to recoup cost of harbormaster services, which included incidental supervision of and assistance to boats in harbor, was sufficiently particularized to moored boaters charged); *Winthrop* v. *Winthrop Hous. Authy.*, 27 Mass. App. Ct. at 647 (annual sewer use fee instituted to distribute cost of operation and maintenance of sewer system particularly benefited those charged, who were all the landowners connected to the system).

The defendants argue that the SCPP charge is no different from the hook-up fee charged to new customers by the Hull Municipal Lighting Plant, which was recently upheld in *Bertone* v. *Department of Pub. Util.*, 411 Mass. 536 (1992). In *Bertone*, however, the hook-up charge was "an amount that reasonably relates to the incremental cost of the additional facilities needed to provide them with service . . . [and] paid 'for only those improvements to the system . . . necessitated by the new customers, and hence . . . will benefit them alone, and the remaining improvements are paid for by rate increases imposed on all customers.'" *Id.* at 546. Additionally, at the time the utility instituted the hook-up fee (in anticipation of imminent condominium development and substantial increases in peak loads), the existing electrical system was capable of meeting the then-current load, and all

necessary maintenance was covered by the rates charged all users for electricity. *Id.* at 539. By contrast, the Danvers sewer system was inadequate to meet the community's needs as far back as 1964, and the SCPP was intended not so much as a means of financing new infrastructure needed to accommodate new users, as in *Bertone,* as to repair problems inherent in the existing system. The SCPP charge was thus not "sufficiently particularized," *Emerson College,* 391 Mass. at 425, to justify distributing the costs of the SCPP among new customers only and not among all sewer users.

The judge also correctly viewed the sewer connection charge as failing the second *Emerson College* test for a valid fee, i.e., in being mandatory rather than optional.[6] Although, "[i]n the absence of an appropriate health and safety measure requiring a sewer connection . . . the use of the common sewer is a matter for decision by the owner," *Fluharty* v. *Selectmen of Hardwick,* 382 Mass. 14, 17 (1980), just such a measure, requiring sewer connection in the instant circumstances, appears in the State Environmental Code:

---

[6]This second criterion set forth in the *Emerson College* decision is arguably only subsidiary to, and an additional manifestation of, the analytically more comprehensive first factor, particularized private rather than general public benefit. See 391 Mass. at 426 ("Further confirmation of the public nature of the benefit conferred by [the] services [for which the charges were imposed] may be derived from the fact that 'use' of [such services] is compelled . . . [and not] voluntarily requested . . . . [T]he benefits for which [the] charges are imposed were [not] limited to the owners of [the properties being charged but instead were] essential to the public welfare"). In *Bertone* v. *Department of Pub. Util.,* 411 Mass. at 549, which held that a municipal charge for hook-up to a utility service satisfied the first test for a valid fee, the court observed that such a charge was not a compulsory property tax merely because the only way to avoid it is to "relinquish [the] right to develop the land." Published decisions since *Emerson College* have, however, uniformly discussed all three of the factors identified in that case for distinguishing a fee from a tax in concluding that challenged fees were not really taxes. See *Southview Co-operative Hous. Corp.* v. *Rent Control Bd. of Cambridge,* 396 Mass. 395, 402-404 (1985); *Bertone* v. *Department of Pub. Util.,* 411 Mass. at 548-550; *Commonwealth* v. *Caldwell,* 25 Mass. App. Ct. at 94-97; *Winthrop* v. *Winthrop Hous. Authy.,* 27 Mass. App. Ct. at 646-648 (both *Caldwell* and *Winthrop* describing the *Emerson College* analysis as "the three-part test," 25 Mass. App. Ct. at 95; 27 Mass. App. Ct. at 647).

"No individual sewage disposal system or other means of sewage disposal shall be located, constructed, altered, repaired, or installed where a common sanitary sewer is accessible adjoining the property and where permission to enter such sewer can be obtained from the authority having jurisdiction over it."

. . .

"Individual sewage disposal systems or other means of sewage disposal shall not be approved where a common sanitary sewer is accessible adjoining the property and where permission to enter such a sewer can be obtained from the authority having jurisdiction over it. The Board of Health may require the owner or occupant of an existing building or buildings, wherever a common sanitary sewer is accessible in an abutting way, to cause such building or buildings to be connected with the common sanitary sewer in a manner and within a period of time satisfactory to the Board of Health."

310 Code Mass. Regs. §§ 15.02(1), (12) (1986). We see no merit in the defendants' circular argument that permission to connect cannot "be obtained" in Danvers, within the meaning of these regulations, without paying the very charge that is here being challenged as an illegal tax.

Finally, *Emerson College* held that the third prong of its test (see *supra*, note 5) — whether the charge is earmarked for paying expenses incurred in providing the services for which the charge was imposed or destined instead for a broader range of services or the general fund, 391 Mass. at 427 — need not be separately satisfied in order to strike down a purported fee as a tax. *Ibid.* Nonetheless, the judge was right in concluding (essentially on the basis of the town's own admissions) that the SCPP charge payments are tax, rather than fee-like, since they are deposited into the general fund and are available to be used for many other sewer projects than improvements and capacity expansion for the purpose of accommodating new connections.

3. *Denial of class certification.* Portside asserts that justice and equity were disserved by the judge's denial of its class

certification motion, claiming that it had satisfied all of the requirements of Mass.R.Civ.P. 23(a), 365 Mass. 767 (1974). The judge offered no explanation for her denial of certification[7]; but that need not preclude affirmance if there are obvious reasons, or any sound basis, for justifying the judge's ruling. See *Thibeault* v. *New Bedford*, 342 Mass. 552, 555 (1961); *Aetna Cas. & Sur. Co.* v. *Continental Cas. Co.*, 413 Mass. 730, 734 (1992); *Doeblin* v. *Tinkham Dev. Corp.*, 7 Mass. App. Ct. 720, 722 (1979); *McMann* v. *State Ethics Commn.*, 32 Mass. App. Ct. 421, 422 n.2 (1992). See also *Horton* v. *Goose Creek Indep. Sch. Dist.*, 677 F.2d 471, 488 (5th Cir. 1982).

It is apparent that the judge must have decided that Portside had not satisfied its acknowledged burden of proof to establish every element of entitlement to class action certification, for the reason, if no other, that she "took account of alternative procedural devices and methods," *Carpenter* v. *Suffolk Franklin Sav. Bank*, 370 Mass. 314, 319 (1976), which she must have deemed superior to a class action. See Mass.R.Civ.P. 23 (b), 365 Mass. 768 (1974). In the judgment, entered six days after the denial of the certification motion, the judge ordered the defendants to notify all of the 135 other persons and entities who had paid sewer connection charges under the SCPP (whose identities and addresses were known to the town) of the decision and judgment ordering the town to refund all of the SCPP charges paid by Portside, and "also [to] advise such persons and entities of the abatement procedures provided by law pursuant to which they may request abatement of the amount paid for such sewer connection permit."

Portside has failed to persuade us that the class action ruling constituted an abuse of the "broad discretion" enjoyed by a judge in deciding rule 23 motions, see *Brophy* v. *School*

---

[7]We have previously observed that, "in order to determine whether an action may be maintained as a class action, the court must carefully apply the criteria set forth in rule 23 . . . to the facts of the case." *Sniffin* v. *Prudential Ins. Co.*, 11 Mass. App. Ct. 714, 724 (1981). But the judge is not required to do so in writing on a rule 23 motion, see Mass.R.Civ.P. 52(a), 365 Mass. 817 (1974), even though "[a]n appellate court is always grateful for findings," *Greenleaf* v. *Massachusetts Bay Transp. Authy*, 22 Mass. App. Ct. 426, 431 (1986), which, of course, greatly facilitate review.

*Comm. of Worcester*, 6 Mass. App. Ct. 731, 735 (1978) — a discretion that is particularly extensive when dealing with the "superiority" requirement of rule 23(b). See *Fletcher* v. *Cape Cod Gas. Co.*, 394 Mass. 595, 601 (1985). Portside has not demonstrated either the illegality, unavailability, or unfeasibility of the abatement process envisioned by the judge.

Portside contends only that abatement was not available as a matter of law prior to the commencement of its action (an assertion unadopted by any case authority, not clearly supported by the statutes Portside cites, and irrelevant even if correct) and that it would be "grossly unfair" to let others profit from a lawsuit whose entire expense Portside has borne. These arguments fall short of meeting the "heavy burden," *Mazzoleni* v. *Cotton*, 33 Mass. App. Ct. 147, 152 (1992), involved in establishing abuse of discretion — a burden which requires a showing either that the discretionary exercise was "characterized by arbitrary determination, capricious disposition, whimsical thinking, or idiosyncratic choice," *New England Allbank for Sav.* v. *Rouleau*, 28 Mass. App. Ct. 135, 144 (1989), or that "no conscientious judge, acting intelligently, could honestly have taken the view expressed by [her]." *Davis* v. *Boston Elev. Ry.*, 235 Mass. 482, 502 (1920).

The judge's remedial choice, which could "appropriately assume that [the] public officials [of the town] will act in accordance with their judicially defined duties," *Doe* v. *Registrar of Motor Vehicles*, 26 Mass. App. Ct. 415, 425 n.18 (1988), was well within the ambit of rationality.[8]

*Judgment affirmed.*

---

[8]The considerations supporting class action status lost much of their force upon the judge's resolution of the substantive issue. With only liquidated money claims of the other, easily identified SCPP charge payers to be satisfied, by means of an administrative process, the principal purposes served by class actions — conservation of judicial resources and avoiding the financial waste of multiple litigations — no longer obtained. See Smith & Zobel, Rules Practice § 23.1 (1975). Cf. *Carpenter* v. *Suffolk Franklin Sav. Bank*, 370 Mass. at 320.