Sidney A. Morton & others[1] *vs.* Town of Hanover & others.[2]

No. 95-P-1793.

Plymouth. December 5, 1996. - July 23, 1997.

Present: Perretta, Kass, & Jacobs, JJ.

*Water. Municipal Corporations,* Water rates, Fees. *Constitutional Law,* Taxation. *Consumer Protection Act,* Availability of remedy, Trade or commerce. *Civil Rights,* Availability of remedy.

A municipality's board of public works had authority under St. 1930, c. 39, and G. L. c. 41, § 69D, to determine the applicable water rates [198-199] and, with respect to a certain challenged water rate surcharge, where the record of an action for declaratory relief demonstrated that the improvements for which the surcharge was imposed particularly benefited the users surcharged and that the income from the surcharge compensated the municipality for the expense of the improvements, the judge correctly declared the surcharge a fee, as opposed to a tax [199-204].

The record of a proceeding for declaratory relief demonstrated that plaintiffs had not been denied adequate notice or opportunity to be heard on a proposed water rate increase [204-205] and that there was a reasonable basis for assessing a surcharge on certain water users for water service benefits particularized to them and the surcharge was not discriminatory [205].

A town and its board of public works were not persons engaged in trade or commerce so as to be amenable to an action under G. L. c. 93A. [205-206]

Where a municipal water rate surcharge was fairly imposed on the principal beneficiaries of certain water system improvements, after adequate notice and opportunity to be heard, the water users were not entitled to any relief on their claims under 42 U.S.C. § 1983 for violations of due process and equal protection. [206]

Civil action commenced in the Superior Court Department on November 25, 1991.

[1]Various business owners, tenants, and residents in the Washington Street area, all water users in the town of Hanover.

[2]The board of public works, the board of assessors, and the tax collector of Hanover.

The case was heard by *Hiller B. Zobel*, J., on motions for summary judgment.

*Charles J. Hayes* for the plaintiffs.

*James A. Toomey* for the defendants.

JACOBS, J. Claiming that the defendants levied illegal surcharges on their use of town water beginning in August, 1989, the plaintiffs sought declaratory and injunctive relief in the Superior Court in 1991, to set aside the imposition and collection of those charges. They subsequently added to their complaint a count requesting conversion to a class action under G. L. c. 93A, § 11, and a count claiming violation of constitutional rights of equal protection and due process under 42 U.S.C. § 1983. The plaintiffs' complaint was dismissed on cross motions for summary judgment. The judge's written decision, which suffices as the requested declaration, concludes that the surcharge reasonably is related to the purposes for which the town was authorized by St. 1930, c. 39, to supply water to its inhabitants.

The material facts are not disputed.[3] Essentially carrying out certain recommendations in a 1979 engineering report, the town's board of public works (BPW) saw to the construction of several improvements in the town's water system, including the installation in 1987 of 10,000 linear feet of a new 16-inch diameter water main along Washington Street. In this appeal the plaintiffs principally claim that the benefits from the new water main are not particularized to them, and that the surcharge is "a tax to finance capital improvements collected disproportionately from a small group of mainly commercial establishments on Washington Street, when it should be collected town-wide."

1. *Statutory authority.* The plaintiffs' central argument is that the BPW had no authority under St. 1930, c. 39, to impose the surcharge. They assert that the surcharge is "an illegal tax on real property" and that § 6 of that statute contemplates that the cost of paying for notes and bonds issued for purposes of the statute is to be assessed as taxes. The statute, in § 1, generally grants to the town the authority to "supply itself and its inhabitants with water . . . and . . . regulate the use of such water and fix and collect rates to be paid for the use of the same." In § 2 the town is authorized to "lay down and maintain . . . pipes

---

[3]The summary judgment submission principally consists of a joint statement of uncontested facts which references several exhibits.

and other works" for the purpose of establishing and maintaining a "complete and effective water works." Section 8 vests all the authority granted to the town by the statute in the board of water commissioners, now the BPW, see G. L. c. 41, § 69D, with the exception of the authority to issue bonds or notes and provide for their repayment as stated in §§ 5 & 6.[4] Section 9 grants authority to the BPW to "fix just and equitable . . . rates for the use of water."[5]

Thus, the BPW had lawful authority to determine the plaintiffs' water rates. Those rates are valid if they are not "taxes," were established according to lawful procedure, and also are "just and equitable."

2. *The surcharge as a fee or a tax.* The plaintiffs rely on an analysis of the three criteria stated in *Emerson College* v. *Boston*, 391 Mass. 415, 424-425 (1984), to support their asser-

[4]The relevant provisions of these sections are:

"SECTION 5. Said town may, for the purpose of paying the necessary expenses . . . incurred . . . under the provisions of this act, issue from time to time bonds or notes. . . .

"SECTION 6. Said town shall, at the time of authorizing said loan . . ., provide for the payment thereof in accordance with the provisions of section five; and when a vote to that effect has been passed, a sum which, with the income derived from the water rates, will be sufficient to pay the annual expense of operating the water works . . . and the maintenance of its pipe lines . . . and the interest as it accrues on the bonds or notes issued as aforesaid, and to make such payments on the principal as may be required under the provisions of this act, shall without further vote be assessed by the assessors of the town annually thereafter in the same manner as other taxes, until the debt incurred by the said loan . . . is extinguished.

"  . . .

"SECTION 8. . . . All the authority granted to the town by this act, except sections five and six, and not otherwise specially provided for shall be vested in said board of water commissioners, who shall be subject, however, to such instructions, rules and regulations as said town may impose by its vote."

[5]"SECTION 9. Said commissioners shall fix just and equitable prices and rates for the use of water, and shall prescribe the time and manner of payment. The income of the water works shall be appropriated to defray all operating expenses, interest charges and payments on the principal as they accrue upon any bonds or notes issued for water supply purposes. If there should be a net surplus remaining after providing for the aforesaid charges it shall be appropriated for such new construction as the water commissioners, with the approval of the town, may determine upon, and in case a surplus should remain after payment for such new construction the water rates shall be reduced proportionately. All authority vested in said commissioners by the foregoing provisions of this section . . . shall be subject to the provisions of section eight."

tion that the surcharge is an illegal tax. The defendants rely, as did the judge, on such an analysis to conclude the surcharge is a legitimate fee. We are mindful that the nature of the surcharge at issue "must be determined by its operation rather than its specially descriptive phrase." *Thomson Elec. Welding Co.* v. *Commonwealth,* 275 Mass. 426, 429 (1931). The surcharge in this case does not fall precisely into any of the categories of user fees or regulatory fees which the cases based on *Emerson College* have analyzed. See, e.g., *Berry* v. *Danvers,* 34 Mass. App. Ct. 507 (1993). See also 16 McQuillin, Municipal Corporations § 44.62.20 (3d ed. 1994 & Supp. 1996). It does, however, have more of the characteristics of a fee than a tax. The three *Emerson College* criteria are helpful to our analysis.

The first of the *Emerson College* factors is: "Fees are legitimate to the extent that the services for which they are imposed are sufficiently particularized as to justify distribution of the costs among a limited group (the "users," or beneficiaries, of the services), rather than the general public." *Id.* at 425. We conclude that this record demonstrates that the benefits of increased water flow from the 16-inch main are sufficiently particularized to the surcharged users.

The record supports the judge's conclusion that the water main at issue constitutes "improvements to the water system [which] addressed deficiencies peculiar to the [Washington Street] Route 53 area, created by an increase in new users and by intensified system usage in that area." The plaintiffs argue that they are not more particularly benefited than the town as a whole because they continue to receive their "domestic water" from an existing 8-inch diameter water main which was not replaced, and because the purpose of the new 16-inch main is for general fire protection, and is interconnected with other town-wide improvements.

In the 1979 engineering report, the existing 8-inch diameter water main along Washington Street, installed in the mid-1930's, is described as "totally inadequate to service the commercial enterprises that have been built in the last decade." Consequently, the report continues, "[t]o ensure adequate service to these existing and any proposed new enterprises, and most importantly to provide adequate fire flows to this area, the construction of 10,000 linear feet of 16-inch water main along Washington Street is recommended." The record indicates that the 16-inch main, with a northerly flow, is fed from a new 24-

inch main from the town's water treatment facility. The 16-inch main begins at a junction with a 20-inch main which branches out westerly to serve other areas of the town to the north, west, and south. Other mains separately connected near the treatment plant directly serve other areas of the town generally to the south. In a stipulation of the parties provided after oral argument, the 16-inch main is described as "connected to the fire hydrants on Washington Street (Route 53) up to the southerly side of the bridge over Route 3. It then connects to the original 8[-inch] main under the bridge which in turn is connected to both the existing 8[-inch] main and a new 12[-inch] main connected to fire hydrants on the northerly side of the bridge to Webster Street." Additionally, "[t]here are a number of 8[-inch] crossover pipes connecting the 16[-inch] and 12[-inch] mains with the 8[-inch] main."[6] The record contains no quantified information on volumes flowing through the new or existing mains, nor is there any information as to how these flow volumes relate to the town as a whole. While the main at issue has an "interconnectedness" with the entire system, it is clear from the record that it confers particular benefits on a limited portion of the town and on a limited number of water users, generally represented by the plaintiffs. Indeed, because the plaintiffs argue that "the benefit is not particularized to the owners of the abutting property . . . [but rather is available to many others such as] tenants, shoppers, employees, delivery persons, [and] visitors," they underscore the conclusion that such benefits primarily accrue to the commercial enterprises in the area served by the mains. Moreover, the factual stipulations concerning interconnections between the new and existing mains serving the plaintiffs further support the conclusion that the new mains will provide for increased flow and pressure for the existing mains, and thus that fire protection is not the entire benefit derived from the new main.[7] The plaintiffs have not demonstrated that the primary benefits of the 16-inch main accrue to

[6]We note that the record contains an affidavit of plaintiff Sidney A. Morton, apparently not objected to below, which states his belief that none of about fourteen abutting properties, or several fire hydrants, was connected to about 1,500 feet of the northerly portion of the 16-inch main during his view of the construction. That limited view does not support such a conclusion applicable to the entire water main and does not raise a material issue of fact.

[7]The plaintiffs assert that the "only purpose" of the water main at issue is for fire protection; that "large diameter water mains . . . are the functional equivalent of reservoirs . . . [which] supply fire companies," and because fire may spread, that the entire town benefits from the water main. Thus, they

the town generally. See *Bertone* v. *Department of Pub. Util.*, 411 Mass. 536, 549 n.12 (1992).

The second *Emerson College* factor concerns whether the use of the services is voluntary or is compelled: a fee charged for a service is not a tax if the use of the service is voluntary. While the judge's opinion that the plaintiffs could avoid the charge by not using town water is more theoretical than pragmatic, his legal conclusion that the voluntariness factor does not preclude treating the surcharge as a fee is correct. The fact that the plaintiffs' use of the service is not truly optional is not determinative. There is substantial authority suggesting that the voluntariness factor should not be given conclusive meaning. "The second criterion set forth in the *Emerson College* decision is arguably only subsidiary to, and an additional manifestation of, the analytically more comprehensive first factor, particularized private rather than general public benefit." *Berry* v. *Danvers*, 34 Mass. App. Ct. 507, 512 n.6 (1993). See the discussion in *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgmt. Bd.*, 421 Mass. 196, 206 & n.11 (1995) (lack of choice "not a compelling consideration which can be used to invalidate an otherwise legitimate charge"). See also *Bertone* v. *Department of Pub. Util.*, *supra* at 549 ("services are 'sufficiently particularized' to justify distributing their costs among the [plaintiffs] and not to all customers").

The third *Emerson College* factor, that "the charges are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses," 391 Mass. at 425, needs little discussion. There is no record evidence that the income from the surcharge or water rates has been, or is, used for general revenue purposes. In any event, water rates readily are distinguishable from taxes. See McQuillin, *supra* at § 44.02. We conclude the surcharge bears few characteristics of a tax and should not be so construed.

---

argue that fire protection is a duty to the public at large, as is the maintenance of adequate water service. We already have determined that fire protection is not the sole benefit derived from the water main. Even if a major purpose of the main is fire protection, there is no showing on this record that such benefits to the private property interests here are sufficiently related to "the property and safety interests of the public at large." *Emerson College* v. *Boston*, 391 Mass. at 426. We deem the "spreading of fire" argument to have a very limited application in this case. Given the scope which the plaintiffs urge for that argument, no water system improvement for fire protection ever could be treated as a particularized benefit.

3. *Basis of the surcharge.* The same engineering firm which prepared the 1979 report, in 1986 recommended recovery of an estimated cost of $1,238,000 for construction of the 16-inch Washington Street main, advocating that "the immediate abutters" be assessed.[8] The cost recovery report recommended excluding the abutting residential properties, stating "there is no direct benefit to them [because] [t]hey are being adequately served by the present water system," and noted that the new main would affect neither the town's fire insurance rating nor the commercial abutters' insurance rates. The report recommended that the cost of the main be recovered according to a formula based half on assessed property valuation and half on water usage, and assessed on approximately 153 commercial enterprises.[9]

At the 1987 annual town meeting an article authorizing an appropriation of $2,200,000 was passed, providing for the construction of the 16-inch main and other water system improvements, and authorizing the town treasurer to borrow that amount and to issue bonds and notes. For reasons given in the margin, the town actually issued bonds in the amount of $1,510,000 to be repaid, as announced in a press release, by a quarterly surcharge, annually decreasing for ten years.[10] The record does not reveal the exact amount to be recovered for

---

[8]The purpose of the construction was revisited: "As outlined [in the 1979 report] the main impetus for the 16-inch water main . . . is to meet fire flow requirements along this heavily developed area. At the time of the report about one-third of the fire flow requirements were being met at the Hanover Mall."

[9]The rationale for these two components of the charge was that "there is an implied benefit of better fire protection irrespective of insurance rates," and "the Hanover Mall is by far the highest water user in the town . . . . Therefore an assessment based on water use is justified in that benefit [*sic*] is directly related to usage. The main benefit would be increased water system pressure especially during periods of high water usage. . . ."

[10]Federal and State grants to aid in financing the entire project were applied for, but were not awarded. Portions of the bonded indebtedness and the costs of planning and engineering expenses and the engineering reports were paid from the town's surplus water revenue account. In a January, 1990, news release, the BPW stated that "actual project cost based on contracts signed is $1,810,000 of which $300,000 has already been paid out of the Water Revenue Account. Bonds for the $1,510,000 remaining project cost have been sold as authorized by the May, 1987, annual town meeting, and at that time it was indicated that the bond issue principal and interest would be a surcharge to the users benefiting from the project." In March, 1991, the BPW wrote to the surcharged users that it had reviewed the surcharge and reduced it by 16.2

construction of the Washington Street main, but the precise establishment of that amount is not material to the parties' dispute.

Special costs of extending a system and related costs of expansion of a water supply may be considered in determining a reasonable rate. See *Souther* v. *Gloucester,* 187 Mass. 552, 556 (1905). See also *Henry B. Byors & Sons* v. *Water Commrs. of Northborough,* 358 Mass. 354, 358 (1970). Thus we conclude this record adequately demonstrates that the surcharge was determined on the basis of costs for the water system improvements particularly benefiting the plaintiffs and reasonably is narrowed to recovery of the cost for the water main improvement.

The plaintiffs complain that they should have been afforded procedural protections similar to those contained in G. L. c. 80, § 1, and G. L. c. 40, §§ 42G through 42I, in the determination of the surcharge. Both statutes essentially provide for special assessments for the cost of public improvements benefiting limited land areas. We observe that the determination of the value of a benefit to particular land as required in c. 80 cases has been adequately considered earlier in this decision and, in any event, because the town did not proceed under the provisions of this statute, we need not consider them further. The plaintiffs also assert that the surcharge formula is arbitrary because it is based, in part, on assessed valuation, and that factor "has no relation to water usage." Yet in urging that the special assessment procedures similar to those in G. L. c. 40 be applied, they effectively concede the issue, because the recovery of costs for construction of water pipes under G. L. c. 40, § 42H, may utilize a special rate based on assessed valuation.

To the extent the plaintiffs complain they were not provided with adequate notice they would be surcharged and opportunity to be heard, the record does not support such a claim. Water users were notified that "the water rate increase which will take effect on April 1, 1988 will not cover the costs of the Route 53 project as outlined [in the notice]. This latter funding will come from special charges to the properties in the area in the form of a surcharge on their water bills." The joint statement of uncontested facts indicates the BPW held a number of meetings

---

percent "[b]y inserting only the expenditures for installation of the water mains authorized [by town meeting]," and the downward adjustment also would "reflect the reduced amount to be collected plus the excess collected."

with affected rate payers between March, 1988, and March, 1991. The plaintiffs do not point to any legal process or standard applicable to the determination of water rates in the circumstances of this case, other than the inapplicable c. 80 procedures, nor do they demonstrate that the defendants departed from any applicable process or standard.

Without significant support in the record, the plaintiffs assert on appeal that they are paying for an unspecified portion of upstream system improvements for which they should not be charged. Even if we accept this assertion, it does not alter our conclusion that the surcharge essentially is a fee and not a tax.

4. *The fairness of the surcharge.* When considering the factors which the record reflects the BPW could have taken into account, we conclude that there is a reasonable basis for surcharging the plaintiffs for water service benefits which are particularized to them. "An equitable determination of the price to be paid for supplying water does not look alone to the quantity used by each water taker. The nature of the use and the benefit obtained from it, the number of persons who want it for such a use, and the effect of a certain method of determining prices upon the revenues to be obtained . . . , and upon the interests of property holders, are all to be considered." *Ladd* v. *Boston,* 170 Mass. 332, 335-336 (1898). Some "discrimination of rates is permissible, within reasonable limits, except as between consumers who receive the same service under similar conditions." *Brand* v. *Water Commrs. of Billerica,* 242 Mass. 223, 227 (1922). The plaintiffs fail to show the surcharge is unreasonable or unreasonably discriminatory. See *Henry B. Byors & Sons* v. *Water Commrs. of Northborough,* 358 Mass. at 359.

5. *Other issues.* We agree with the judge's conclusion that the BPW is not a person cognizable under c. 93A. That chapter does not apply where municipal entities do not engage in trade or commerce. The plaintiffs mistakenly rely on a series of tort liability cases, and also *Middleborough* v. *Middleborough Gas & Elec. Dept.,* 422 Mass. 583 (1996), to support their assertion that c. 93A relief is in addition to, and not an alternative to, traditional tort remedies, and that the Legislature "could not have intended to extend governmental immunity to commercial enterprises conducted by government." The plaintiffs also incorrectly rely on *Boston* v. *Aetna Life Ins. Co.,* 399 Mass. 569, 575 (1987) (city of Boston could assert under § 11 claims of patients

assigned to it). For the reasons given in *All Seasons Servs., Inc.* v. *Commissioner of Health & Hosps. of Boston*, 416 Mass. 269, 271 (1993), we have no occasion to consider whether either the town or the BPW is amenable to a c. 93A action because neither acted as a "person" engaged in "trade or commerce." Political subdivisions of the Commonwealth continue to be excluded from cognizance as such "persons" under c. 93A where, as here, they do not act in a business context. See *Bretton* v. *State Lottery Commn.*, 41 Mass. App. Ct. 736, 738-740 (1996), and cases cited.

The plaintiffs are not entitled to relief based on their claims of due process and equal protection violations under 42 U.S.C. § 1983. As the judge concluded, they "have only alleged a possible future deprivation of property through the imposition of liens for nonpayment of the surcharge. That does not suffice." Also, as we have determined, the surcharge was fairly imposed upon the principal beneficiaries of the water system improvements in issue, after adequate notice and opportunity to be heard.

*Judgment affirmed.*