PAUL F. SILVA vs. CITY OF FALL RIVER & another.[1]

No. 02-P-166.

Bristol. April 30, 2003. - November 4, 2003.

Present: BROWN, LENK, & CYPHER, JJ.

*Funeral Director. Dead Body. Municipal Corporations,* Board of health, Fees. *Board of Health. Taxation.*

A city's burial permit charge was a tax that the city was not permitted to impose, where the payer of the charge derived no benefit that was not shared by the general public [801-804], proper interment was mandatory [804-805], and it did not appear that in the record that the funds derived from the charge were used to defray the cost of enforcing the relevant regulations [805-807]. BROWN, J., concurring in the result.

CIVIL ACTION commenced in the Superior Court Department on October 20, 2000.

The case was heard by *Vieri Volterra,* J., on motions for summary judgment.

*Martin A. Silva* for the plaintiff.

*Thomas F. McGuire, Jr.,* for the defendants, submitted a brief.

CYPHER, J. Paul F. Silva, a licensed funeral director, filed a complaint under G. L. c. 231A against the city of Fall River and its board of health (collectively, Fall River) alleging that the twenty-dollar burial permit fee charged by Fall River is an illegal tax and seeking declaratory judgment, injunctive relief, and damages. The parties filed cross motions for summary judgment and a Superior Court judge entered judgment in favor of Fall River, concluding that the burial permit charge was a valid regulatory fee and not an unlawful tax. Silva appeals. We think that the summary judgment record establishes that the burial permit charge exhibits more characteristics of a tax than of a fee.

[1]Board of health of Fall River.

*Standard of review.* " 'The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law.' *Augat, Inc.* v. *Liberty Mut. Ins. Co.,* 410 Mass. 117, 120 (1991). For a grant of summary judgment to be upheld, the moving party must establish that there are no genuine issues of material fact, and that the nonmoving party has no reasonable expectation of proving an essential element of its case." *Miller* v. *Mooney,* 431 Mass. 57, 60 (2000).

*Background.* The parties are in agreement as to the following. Disposition of human remains is a regulated activity. Every dead body of a human being dying within the Commonwealth must be buried, entombed, or cremated within a reasonable period of time after death. G. L. c. 114, § 43M. Such interment requires, among other things, the issuance of a burial permit. G. L. c. 114, § 45. Failure to comply with the relevant laws can result in criminal prosecution. G. L. c. 114, § 43N. See *Commonwealth* v. *Goodrich,* 13 Allen 546, 548-549 (1866); *Commonwealth* v. *Gallison,* 384 Mass. 184, 185 (1981).

Before a dead body may be interred, a burial permit must be obtained from the local board of health or the town clerk of the town where the person died. G. L. c. 114, § 45.[2] To obtain the permit, the applicant must present a valid death certificate,[3] *ibid.,* and, in Fall River, pay a twenty-dollar fee.[4]

Once issued, the burial permit must be presented to the person in charge of the cemetery or crematory where the permit holder

---

[2]The relevant portion of G. L. c. 114, § 45, provides: "no undertaker or other person shall bury or otherwise dispose of a human body in a town, or remove therefrom a human body which has not been buried, until he has received a permit from the board of health or its agent appointed to issue such permits, or if there is no such board, from the clerk of the town where the person died . . . ."

[3]The death certificate is forwarded to the Registry of Vital Records and Statistics. Until 1955, Fall River paid funeral directors twenty-five cents for each death certificate they obtained and filed. See G. L. c. 46, § 11, as in effect prior to St. 1955, c. 95, § 2.

[4]The nearby towns of Somerset, Swansea, and Westport do not charge a burial permit fee. Some States have statutes authorizing charges for burial permits. See Conn. Gen. Stat. § 7-65 (2003); Me. Rev. Stat. Ann. tit. 30-A, § 2652 (West 1996); N.J. Stat. Ann. § 26:6-17 (West 1996).

seeks to dispose of the body. G. L. c. 114, § 47. That person is required to endorse the fact of burial, removal, or cremation on a coupon that accompanies the burial permit. *Ibid.* The completed coupon is returned to the local board of health issuing the burial permit. *Ibid.* The statutory scheme serves to ensure the proper disposition of human remains.

On July 1, 1995, Fall River began charging a fee of ten dollars for the burial permit. In 2000, Fall River increased the fee to twenty dollars. The fees are deposited into a general account of the city of Fall River.

*Discussion.* Under the Massachusetts Constitution, municipalities do not have an independent power of taxation; however, they may impose fees.[5] *Greater Franklin Developers Assn.* v. *Franklin*, 49 Mass. App. Ct. 500, 502 (2000). "Fees imposed by a governmental entity tend to fall into one of two principal categories: user fees, based on the rights of the entity as proprietor of the instrumentalities used, *Opinion of the Justices*, 250 Mass. 591, 597 (1924), or regulatory fees (including licensing and inspection fees), founded on the police power to regulate particular businesses or activities, *id.* at 602." *Emerson College* v. *Boston*, 391 Mass. 415, 424 (1984).[6]

The disposal of human remains involves the public health

---

[5]Fall River claims that it has authority to charge a fee pursuant to its general power to adopt regulations under G. L. c. 111, § 31. See G. L. c. 40, § 22F, which, when accepted by a city or town, allows municipal boards and officers to fix reasonable fees for licenses, permits, certificates, services, or other work performed. It appears that Fall River has not voted to accept G. L. c. 40, § 22F. Fall River also claims that it is authorized to charge a burial permit fee because "an express statutory grant to a municipality or agency of authority to regulate includes authorization to require licenses and licensing fees 'to cover reasonable expenses incident to the enforcement of the rules.' " *Southview Co-op. Hous. Corp.* v. *Rent Control Bd. of Cambridge*, 396 Mass. 395, 400 (1985), quoting from *Commonwealth* v. *Plaisted*, 148 Mass. 375, 382 (1889). We are not concerned with Fall River's authority to impose a fee, but with whether the exactment is, in reality, a tax.

[6]"Proprietary fees do not implicate the taxation power if 'based on fair recompense for the public moneys expended for initial construction and for adequate maintenance' of the facilities used. *Opinion of the Justices*, 250 Mass. 591, 597 (1924). Similarly, regulatory fees are not taxes if commensurate with governmental expenditures occasioned by the regulated party." *Emerson College* v. *Boston*, 391 Mass. at 425 n.16. The municipality may assess a fee for costs that arise directly in enforcement of the regulatory provisions as well as for all expenses imposed upon it by the business sought to be

and implicates the police power. *Wyeth* v. *Board of Health of Cambridge*, 200 Mass. 474, 479 (1909). Generally, a license or permit fee is a charge for a privilege granted by the license or permit. 9 McQuillin, Municipal Corporations § 26.32, at 92 (3d ed. 1995). A fee exacted pursuant to a regulatory scheme falling within the police powers of a municipality appears, on the surface, to be a valid regulatory fee. See *id.* § 26.16, at 45. Whether an exactment falls within the category of a fee or a tax, however, "must be determined by its operation rather than its specially descriptive phrase." *Thomson Elec. Welding Co.* v. *Commonwealth*, 275 Mass. 426, 429 (1931).

To determine whether a government exaction is a fee or a tax, we consider the following factors: (1) a fee is charged in exchange for a governmental service that benefits the party paying the fee in a manner not shared by other members of society; (2) a fee is paid by choice, in that the fee payer has the option of not utilizing the governmental service and thereby avoiding the charge; and (3) the charge is collected not to raise revenues but to compensate the governmental entity providing the service. *Emerson College* v. *Boston*, 391 Mass. at 424-425. See *National Cable Television Assn.* v. *United States*, 415 U.S. 336, 340-341 (1974).

The burden of proving that the burial permit charge is a tax rather than a fee falls on Silva. *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgmt. Bd.*, 421 Mass. 196, 201 (1995). The parties appear to agree that on this summary judgment record, there are no material facts in dispute and the matter may be decided as one of law. We apply the factors set forth in *Emerson College* v. *Boston, supra.*

1. *Particularized service benefitting the party paying the fee.* The first consideration is whether the charge is for a "particular governmental service which benefits the party paying the fee in a manner 'not shared by other members of society.' " *Emerson*

---

regulated, including "the incidental consequences that may be likely to subject the public to cost in consequence of the business licensed." *Ibid.*, quoting from *United Bus. Commn.* v. *San Diego*, 91 Cal. App. 3d 156, 166 (1979). A regulatory fee is also characterized by the extent of the reliance by the party challenging the fee on an essential regulatory service provided by the governmental entity exacting the fee. *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgmt. Bd.*, 421 Mass. 196, 203 (1995).

*College* v. *Boston*, 391 Mass. at 424, quoting from *National Cable Television Assn.* v. *United States*, *supra*. In other words, "[f]ees are legitimate to the extent that the services for which they are imposed are sufficiently particularized as to justify distribution of the costs among a limited group (the 'users,' or beneficiaries, of the services), rather than the general public." *Id.* at 425. Silva claims that Fall River provides no particularized service for the burial permit fee and that, in the alternative, any service it does provide does not benefit the fee payer in a manner not shared by other members of society.[7] Silva points out that, unlike other mandatory city permits, such as building and food permits, where inspections are routinely made, a burial permit requires no particular governmental service before it is issued.

Fall River responds that Silva derives an economic benefit from the regulation of the disposition of human remains. We think it is perhaps more accurate to state that Silva derives an economic benefit from the regulation of the funeral industry, for which he pays separate licensing fees. In any event, Fall River has cited no authority, nor are we aware of any, for characterizing economic benefits incidental to regulation as a "particular governmental service."

Silva argues that, even if Fall River provides a particularized service for the fee, he receives no special benefit from the receipt of a burial permit because proper and timely disposition of human remains is a public health function that benefits the community at large. In response, Fall River analogizes the burial permit fee to the fee charged for the disposal of low-level radioactive waste. In *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgmt. Bd.*, 421 Mass. at 202-203, a generator of radioactive waste challenged an assessment by the State board regulating disposal of such waste. The Supreme Judicial Court concluded that there was a "sufficiently particularized" benefit to the plaintiff to make the charge a fee rather than a tax, stating that "[w]hile the safe disposal of low-level radioac-

---

[7]For example, Fall River does not inspect the funeral director's premises or the burial or cremation site, and although the local board of health is responsible for regulating cemeteries, Fall River makes no claim that the fee is related to the regulation of cemeteries.

tive waste is a public benefit . . . it is the plaintiff (and not the general public) which requires access to disposal facilities for low-level radioactive waste meeting Federal and State standards." *Id.* at 204-205. We think that the comparison to low-level radioactive waste falls short, if for no other reason than that the funeral director or other burial permit seeker is not the generator of the human remains requiring disposal.

Where charges have been determined to be valid fees rather than taxes, the fee has been for a particular service provided to a discrete group. See *Southview Co-op. Hous. Corp.* v. *Rent Control Bd. of Cambridge,* 396 Mass. 395, 402-404 (1985) (fee paid by landlord to petition for rent adjustment was for particular service benefitting landlord); *Bertone* v. *Department of Pub. Util.,* 411 Mass. 536, 548-549 (1992) (electrical hookup charge was only to new or expanded customers, therefore there was sufficient particularization because new or expanded customers received benefit of new or expanded electricity); *Commonwealth* v. *Caldwell,* 25 Mass. App. Ct. 91, 95-96 (1987) (fee particularized to people choosing to moor boats); *Winthrop* v. *Winthrop Hous. Authy.,* 27 Mass. App. Ct. 645, 647 (1989) (particularized benefit to those users who hooked up to sewer system); *Aiello* v. *Commissioners of the County of Dukes County,* 35 Mass. App. Ct. 151, 153-154 (1993) (charge for town communications center follow-up on electronic alarm signals was particularized to users). Contrast *Emerson College* v. *Boston,* 391 Mass. at 418 n.5, 427 (fire protection once included in general property tax was improperly reclassified as special service); *Greater Franklin Developers Assn.* v. *Franklin,* 49 Mass. App. Ct. at 504 (provision of school facilities is not particularized service but is government's obligation to provide such facilities out of general revenue funds).

That the general public benefits from a regulated system of disposal of human remains cannot be seriously contested. *Wyeth* v. *Board of Health of Cambridge,* 200 Mass. at 479. Compare *Emerson College* v. *Boston,* 391 Mass. at 425-426 (fire protection services benefitted not just property interests of owner but occupants of building and surrounding buildings and their occupants); *Berry* v. *Danvers,* 34 Mass. App. Ct. 507, 510 (1993) (charge for connecting to sewer system was not just used for

new connections and benefitted all users); *Greater Franklin Developers Assn.* v. *Franklin,* 49 Mass. App. Ct. at 503 (benefit of expanded school facilities was not particularized to fee payers).

We think that the issuance of the burial permit does not benefit Silva or any other permit seeker in a manner not shared by the general public. The enforcement of regulations regarding the disposal of human remains is an essential governmental function.

2. *Choice of payment.* The second factor is whether the charge is paid by choice "in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge."[8] *Emerson College* v. *Boston,* 391 Mass. at 424-425. According to *Emerson College,* whether a person may choose to avoid a fee is determined by whether the person challenging the fee may avoid engaging in the activity for which the charges are assessed. *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgmt. Bd.,* 421 Mass. at 205.

Silva argues that he has no choice but to procure a burial permit. The motion judge concluded that Silva may avoid the fee by choosing another profession. See *Bertone* v. *Department of Pub. Util.,* 411 Mass. at 549, quoting from *Southview Co-op. Hous. Corp.* v. *Rent Control Bd. of Cambridge,* 396 Mass. at 402 (fees are not taxes 'even though they must be paid in order that a right may be enjoyed').

That Silva himself, in his capacity as a funeral director, may avoid the fee by choosing another profession does not, however, end the inquiry in the circumstances of this case. The fee payer, ultimately, is the person requiring Silva's services.[9] Anyone seeking to dispose of the remains of a person who died in Fall River will be unable to avoid the fee. See *Berry* v. *Danvers,* 34

---

[8]We have observed that of the three factors in the *Emerson College* test, the second factor, whether the plaintiff's use of the service is truly optional, is not necessarily determinative of whether a charge is a fee or a tax. See *Morton* v. *Hanover,* 43 Mass. App. Ct. 197, 202 (1997). Rather, it is "arguably only subsidiary to, and an additional manifestation of, the analytically more comprehensive first factor, particularized private rather than general public benefit." *Berry* v. *Danvers,* 34 Mass. App. Ct. at 512 n.6.

[9]The cost of the burial permit fee is passed on to the person seeking to dispose of human remains, typically the next of kin.

Mass. App. Ct. at 512-513 (charge was tax where State Environmental Code required use of local sewer system and did not permit construction of private sewer system). Moreover, the fact that proper interment and the burial permit are compelled is further confirmation of the public nature of the benefit. "Fees generally are charged for services voluntarily requested." *Emerson College* v. *Boston*, 391 Mass. at 426. See *National Cable Television Assn.* v. *United States*, 415 U.S. at 341 (fee is incident to voluntary act).

3. *The purpose of the fee.* The final factor under the *Emerson College* test is whether the charge is made for the purpose of raising general revenue or for the purpose of covering the cost of the governmental service. Fall River may charge a fee for reasonable expenses incident to enforcement of the statutory requirement that it issue burial permits, as municipalities have authority to impose fees "to cover reasonable expenses incident to the enforcement of the rules." *Commonwealth* v. *Plaisted*, 148 Mass. 375, 382 (1889). See *Southview Co-op. Hous. Corp.* v. *Rent Control Bd. of Cambridge*, 396 Mass. at 400.

Other than Fall River's assertion in its brief that the money collected is a best estimate of the cost of record-keeping, there is nothing in the record indicating what the charges are for or what expenses Fall River incurs as a result of the burial permit requirement.[10] No affidavit in support of Fall River's motion for summary judgment or in opposition to Silva's motion appears in the record. There is no reference to any expenses caused by the burial requirements or other services provided by Fall River in the parties' statement of undisputed facts. There is also nothing in the record to indicate that Fall River checks the issued burial permits to be certain that the coupon verifying burial has been returned.

---

[10]It does not appear that Fall River provides any regulatory service to the funeral industry. Silva introduced evidence by way of affidavit and exhibits that the funeral industry is regulated by the board of registration in embalming and funeral directing. See G. L. c. 112, §§ 82-87; 239 Code Mass. Regs. §§ 3.00-3.16 (1998). The local board of health issues licenses to the funeral homes, but otherwise provides no regulatory services to the funeral industry. G. L. c. 114, § 49. Under G. L. c. 114, § 37, the board of health is authorized to make regulations concerning burial grounds and interments within the town. Under G. L. c. 114, § 34, the board of health is charged with approving the use of land for cemeteries.

Silva points to the fact that the fees are deposited in Fall River's general account as evidence that the fees were "destined instead for a broader range of services or the general fund." *Berry* v. *Danvers*, 34 Mass. App. Ct. at 513. Fall River claims in its brief that the fee represents a reasonable estimate of the cost of the service provided, which is the service of supervision and record keeping in connection with the disposition of each dead body and that the fee is not large enough to subsidize general governmental operations.[11]

In some circumstances, a rough estimate may be sufficient. See *Aiello* v. *Commissioners of the County of Dukes County*, 35 Mass. App. Ct. at 154 (fee was crude estimate but there was no showing that charges significantly and consistently exceeded cost of services). Furthermore, it has been suggested, at least with regard to license fees, that the amount of the fee would not be "scrutinized too curiously even if some incidental revenue were obtained." *Southview Co-op. Hous. Corp.* v. *Rent Control Bd. of Cambridge*, 396 Mass. at 403, quoting from *Opinion of the Justices*, 250 Mass. at 602.

Here, however, with uncontradicted evidence that the funds are deposited to Fall River's general account and nothing in the record to indicate the basis on which the charge was calculated or how the funds are used to defray expenses, we cannot conclude that the money collected is not used to subsidize general governmental operations. See *Berry* v. *Danvers*, 34 Mass. App. Ct. at 513 (where revenue was deposited into general fund and was available for use for many other sewer projects it was properly characterized as tax). Contrast *Bertone* v. *Department of Pub. Util.*, 411 Mass. at 550 (revenue generated by fee was not added to general fund for service to all but was targeted to newly required construction); *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgmt. Bd.*, 421 Mass. at 207 (charge was fee where it funded particularized services

---

[11]We observe that the Legislature has provided a mechanism by which municipalities can charge fees for certain filing actions in the absence of other appropriate municipal authorization. See G. L. c. 262, § 34, which enumerates the fees for certain filing actions. The statute permits a municipality to charge a fee for furnishing a birth or a death certificate but does not authorize a fee for the recording of the birth or death.

provided by board, no part of charge was treated as general revenue and, in fact, went into separate fund).

*Conclusion.* It is tempting to characterize the burial permit fee as a valid regulatory fee because, after all, there are other events in life that are also unavoidable and in which regulatory power of government is necessarily involved. Birth, sewer use, and water use easily come to mind. When examined closely, however, the comparisons fail. While a municipality may charge a fee for furnishing a copy of a birth certificate, there is no charge for recording a birth. See G. L. c. 262, § 34. It appears that the burial permit fee is a charge for merely recording the permit. Sewer use charges have been found to be an invalid tax in circumstances where the use was compelled. See *Berry* v. *Danvers,* 34 Mass. App. Ct. at 512-513. As for water, we concluded that a municipality's surcharge on the use of town water was a valid fee because, in the circumstances of the case, the benefits of the service supported by the fee were sufficiently particularized to the surcharged users and there was nothing in the record to suggest that the fee was used to supplement the general revenue. See *Morton* v. *Hanover,* 43 Mass. App. Ct. 197, 200, 202 (1997).

We think that the burial permit charge is better characterized as a tax than a fee because the payer of the fee derives no benefit that is not shared by the general public, proper interment is mandatory, the burial permit is mandatory, and it does not appear in the record that the funds are used to defray the cost of enforcing the relevant regulations. The judgment declaring that the burial permit charge is a fee is vacated. We remand the case for further proceedings consistent with this opinion.

*So ordered.*

BROWN, J. (concurring in result). I see no need to take a position on the analysis of the majority. I write only to point out that Fall River, like so many other litigants, did not fully appreciate the devastating consequences that may ensue from a

failure to understand the summary judgment procedural protocol.

As soon as the summary judgment materials were presented to the Superior Court for resolution, Fall River was doomed, as it had failed to controvert the assertions of the moving party. See *Community Natl. Bank* v. *Dawes*, 369 Mass. 550, 553-556 (1976), for boilerplate language setting out the prescribed scenario to be followed in a summary judgment context. *Dawes* is the seminal case, but its progeny is long and explicit.